In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-11-00401-CR
_____

GEORGE LORAN DANA, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 1A District Court
Tyler County, Texas
Trial Cause No. 11414

OPINION

Appellant George Loran Dana pleaded "not guilty by reason of insanity" to the charge of aggravated assault with a deadly weapon. The jury found him guilty. Dana claims that he was legally incompetent to stand trial, and that evidence of his drug use was improperly admitted. He claims that the evidence is legally insufficient to support the jury's deadly weapon finding. And he argues that the statutory prohibition against informing jurors of the consequences of finding him insane violated his right to a fair trial.

1

We conclude that the record supports the trial court's competency determination. Because the evidence of drug use was relevant, admissible under Rule 404(b), and not unfairly prejudicial, the trial court did not abuse its discretion in admitting the evidence. The injuries inflicted and the testimony establish that the knife was a deadly weapon. Finally, we reject the attack on the statutory prohibition. The record reflects a fair trial. We overrule appellant's issues and affirm the trial court's judgment.

THE TESTIMONY

According to testimony at trial, Amtgard is an organization whose members recreate "fantasy elements of Renaissance" in costume, fight with foam swords, and participate in a "medieval feast." The organization had a gathering at a campground near Colmesneil, Texas. F.L., an Amtgard member, became aware of a man, later identified as Dana, who was not in costume and was walking around the cars. F.L. approached Dana and asked him how he was doing. Describing Dana as "incoherent" and "kind of fidgety[,]" F.L. testified Dana "looked aggravated" and was speaking rapidly and mumbling. F.L. explained he has seen a lot of "speed freaks[,]" and Dana looked "messed up" and "real high up on something."

F.L. told Dana that the area had been reserved. Expressing his concern about Dana's "being around everybody's cars[,]" F.L. asked Dana to leave if he did not intend to watch the events. At that point, Dana turned and appeared to punch B.L., another Amtgard member, in the stomach. F.L. grabbed Dana by the shoulders and attempted to

2

pull him away, but Dana struck him in the face. Someone screamed that Dana had a knife. F.L. realized his face had been cut. After several other people intervened, Dana was subdued, and F.L. was taken to the hospital by ambulance. He received twenty-seven stitches.

On the day in question, B.L. heard the sounds of an altercation approximately fifty yards away. He left his campsite to attempt to "calm the situation down." While walking toward the location, he felt what he believed was a punch to his stomach. He did not see the person who struck him because it was too dark. He looked down and saw that his hand, which he had been holding over his stomach, was covered with blood.

Another Amtgard member, P.K., testified he saw a man he did not recognize walking around looking in vehicles and at campsites. Dana was listening to P.K. and his friends talk while they were setting up camp. P.K. saw Dana attempt to open a locked truck. Dana approached the group and said, "What did you say about me?" P.K. told him that they were not talking to him. Dana repeated his question, and P.K. told him that the area had been rented and asked Dana to return to his own campsite. P.K. testified Dana "said, that ain't going to work. And someone effectively said he's got a knife." Dana "swung" at P.K. "five or six times." P.K. called 911. He later discovered that his right forearm had been cut during the altercation. When defense counsel asked whether anything about Dana left him with the impression that Dana was on drugs, P.K. testified,

3

"Just the fact that . . . we had three or four pretty good-sized people that had subdued him; and he was still . . . able to fight them off."

Upon arriving at the scene, Deputy Matthew Phillips observed a group of men standing around a picnic table. With assistance from some of the men present, Phillips picked Dana up from the ground, placed him on the hood of the patrol car, and put hand restraints on him. Dana was uncooperative, tried to remove the restraints, and attempted to kick Phillips. Phillips applied leg restraints. He explained that no drugs were found on Dana, and no toxicology screen was performed. Phillips determined what happened that night by talking to people at the scene. He learned of the knife when "[o]ne of the witnesses handed it to Deputy Calhoun[.]" Phillips testified that the knife was capable of causing serious bodily injury or death.

Deputy Donald Calhoun helped Phillips restrain Dana. Someone at the scene approached Calhoun and gave Calhoun a knife and a screwdriver. Calhoun took Dana to jail. Although no drugs were recovered, Calhoun testified he has encountered people who did not have illegal substances in their possession, but were intoxicated on illegal substances.

The defense called Tonya Cashat to testify. She explained she was in a romantic relationship with Dana, and she, Dana, and their daughter lived in a trailer at the campground where the Amtgard event took place. During the week before the occurrence, Cashat was not working outside the home because she had the flu. Dana, who

4

normally stayed home to care for their daughter, was at home every day. Cashat testified that Dana was always agitated and "always believed that there was someone after him." During that week, Dana never left the house without Cashat. On the day of the incident, she never saw Dana take narcotics.

According to Cashat, when the Amtgard members began entering the campground, Dana became more agitated and paranoid. He believed the Amtgard members were coming to kill Cashat or their daughter. Cashat explained that Dana was very fidgety, and he believed that television shows were sending him messages concerning what was about to happen. According to Cashat, "the longer the day went, the more people c[a]me, the more they surround us, the more [Dana] gets agitated, because the more trapped we're getting."

Cashat attempted to calm Dana by taking him away from the campground for a while that day. She explained that when they returned to the campground, Dana again became agitated. Cashat testified that Dana believed that his oldest daughter and her mother were bound and gagged in one of the Amtgard vehicles, so Dana began walking around the campground to try to save them. He eventually ran to the Amtgard area, but Cashat did not see what happened. A man approached Cashat and told her Dana had attacked some Amtgard members. Cashat and her daughter left the campground. Cashat denied finding any drugs or drug paraphernalia in the residence when she returned a couple of days later.

Cashat testified that Dana had previously had episodes of agitation and hallucinations. He believed people were doing things against them, such as moving the walls inside their home. Cashat had taken Dana to a mental health center, as well as to Dogwood Clinic to see a nurse practitioner, Alicia Scoggins. According to Cashat, Scoggins prescribed medication. Cashat explained that after Dana's arrest in the campground that night, he was taken to Vernon State Hospital, and she cut off communication with him for a time. Cashat testified that Dana stayed at Vernon for a couple of months, and when he returned from Vernon, he was normal and able to make rational decisions.

During cross-examination of Cashat, she testified as follows:

> Q. [Prosecutor]: Now the reason you went back and would have looked for [drugs] is because in the past [Dana] had used illegal substances; is that correct?
> A. I never went back to look for that. I went back to pack my things, get out.
> Q. So you didn't look? You were going back to pack your stuff?
> A. I went back and packed all my stuff and [my daughter's] things.
> Q. Okay. But in the past you had known that [Dana] had used illegal substances; is that correct?
> A. Yes.

Defense counsel objected and stated, "I don't think I opened this door." The State responded that defense counsel opened the door when he asked Cashat whether she found any illegal drugs or substances when she returned to the trailer. Defense counsel argued that the case was not about prior bad acts, and the State argued that the evidence "goes to the defendant's use of illegal substances[.]" The trial court allowed the testimony.

6

As the State began to question Cashat about her own drug use, defense counsel objected that the testimony about Cashat was improper impeachment, irrelevant, "extremely prejudicial," and "doesn't make it any more likely that [Dana] was on drugs on March the 5th." The State responded that Cashat's testimony would "show the defendant had access to illegal substances[,]" and when defense counsel again objected to relevance, the State responded, that "[i]f he had access four months prior, he had access that day." The State asked Cashat whether she had taken a drug test at her place of employment in December (three months prior to Dana's offense), and she related she had tested positive for methamphetamine. Cashat testified that she had taken methamphetamine with Dana.

Cashat did not remember telling anyone that Dana was "on something" when the assault occurred. During redirect examination, Cashat testified that she passed a random drug test on March 8, 2010. At the conclusion of Cashat's testimony, outside the presence of the jury, defense counsel renewed his objection about prior drug use. He asserted that he did not elicit testimony that opened the door to Dana's alleged drug use at any time prior to the date of the offense. Dana moved for a mistrial. The trial court denied the motion.

Deputy Michael Williams testified that in January or February Dana called the sheriff's office and reported his belief that people were rearranging his cabinets. Williams testified that he went to the residence, examined the cabinets, and looked inside the

7

residence. According to Williams, Dana appeared to be nervous and paranoid. Although he believed Dana might have been on drugs, he did not see evidence of drugs at the residence.

Based upon his review of records relating to Dana, psychiatrist Dr. Edward Gripon testified Dana suffers from schizoaffective disorder. Gripon explained that Dana had been "treated with significant amounts of psychoactive medication, particularly antipsychotics" during Dana's stay at the Vernon facility at North Texas State Hospital. According to Gripon, Dana had been diagnosed with "schizoaffective disorder, bipolar type[,]" and "polysubstance dependency in the past[.]" Gripon testified that in March of 2009, Dana was admitted to another hospital and diagnosed with organic mental disorder secondary to amphetamine use.

Gripon explained that Dana had a "history of some type of drug use in the past[,]" but that "the primary diagnosis is a thought disorder, a form of schizophrenia." While at Vernon, Dana was not diagnosed with "a current drug-related problem." Gripon opined that it is "unlikely" that Dana's symptoms were caused solely by methamphetamines, and he explained that only drugs ingested within approximately twenty-four to seventy-two hours prior to the offense would be a factor in the occurrence of the offense. According to Gripon, use of a stimulant drug like methamphetamine could worsen an underlying schizophrenic illness or defeat the effects of prescribed medication.

8

Cashat's sister, Paula Gibbs, testified that on the night of the stabbing, Cashat called her. Cashat was "hysterical, crying" and told Gibbs that Dana had stabbed three people. Cashat told Gibbs that "he was on something" but "she did not know where he . . . would have gotten it from." Clara McMillin, a witness testifying for the defense, stated Cashat told Paula Gibbs that "[i]f he was on anything, [Cashat] was not aware of it."

The State also called Nick Anthony May, another witness at the scene. May had helped take the knife and screwdriver away from Dana.

COMPETENCY

We consider Dana's fifth issue first. Dana argues he was legally incompetent to stand trial. He argues that because he had been previously found incompetent, the State had the burden to prove beyond a reasonable doubt that he was competent to stand trial. He maintains that the trial court "required virtually no evidence from the State before concluding Dana was competent to stand trial and [his] attorneys raised the issue on several occasions to no avail."

After Dana was indicted, the defense filed a motion for the appointment of a psychologist to assist Dana in preparing a defense. The trial court order granting the motion appointed a psychiatrist and ordered him to evaluate Dana, and Dana was evaluated. Pursuant to Chapter 46B of the Code of Criminal Procedure, the trial court considered the court-appointed psychiatrist's report, found Dana incompetent, and committed him to confinement at the state hospital. The trial court ordered that the period

9

of confinement not exceed one hundred and twenty days. The head of the state hospital subsequently filed a report concluding that Dana had regained competency.

When a trial court determines that a defendant is incompetent to stand trial, the Court may commit the defendant to a mental health facility "[f]or further examination and treatment toward the specific objective of the defendant attaining competency to stand trial." Tex. Code Crim. Proc. Ann. art. 46B.073(b) (West Supp. 2012).[1] When the "head of the facility" is of the opinion that the defendant has attained competency to stand trial, a report is filed with the court, with copies provided to both parties, and the defendant is returned to the committing court. *See* Tex. Code Crim. Proc. Ann. arts. 46B.079(b)(1), (c), 46B.081(West Supp. 2012). Article 46B.084 of the Texas Code of Criminal Procedure requires that, after a defendant has been adjudicated incompetent to stand trial and has been committed to a mental hospital, the trial court must make a judicial determination that the defendant has regained competency before the criminal proceedings against him may be resumed. *See* Tex. Code Crim. Proc. Ann. art. 46B.084(a), (d) (West Supp. 2012); *see also Bradford v. State*, 172 S.W.3d 1, 4-6 (Tex. App.—Fort Worth 2005, no pet.).

During voir dire, defense counsel re-urged the competency issue. The trial court held a hearing outside the jury's presence. Defense counsel argued that although the report concluded Dana was competent to stand trial, the conclusion was based on

---

[1] Because the amendments are not material to this case, we cite to the current version of the relevant statutes in Chapter 46B.

recommendations -- continuation of psychiatric care and compliance with his prescribed psychoactive medication -- that defense counsel contends were not followed since the time of the report.

The competency report was admitted into evidence for purposes of the hearing. Defense counsel called a jailer to testify. The jailer testified that the jailer on duty, sometimes herself, administers Dana's medication to him. She explained that the county doctor visits Dana and refills Dana's prescriptions initially prescribed by the state hospital. She testified that when Dana was an inmate, and prior to his departure for the state hospital, "he would get agitated, he would try to hurt himself or tear something up." Since returning from the state hospital, Dana's demeanor has changed and there have not been any issues with his behavior. She was not aware of any time when she was on duty that Dana had not been given his prescribed medications. Only one of his prescriptions was terminated, and that was with the consult of his psychologist at the state hospital.

The record, including the report of competency, supports the trial court's conclusion. The trial court did not err in determining Dana was competent to stand trial. Dana's fifth issue is overruled.

VOLUNTARY INTOXICATION EVIDENCE AND INSTRUCTION

In his first issue, Dana argues that the trial court erred by admitting Cashat's testimony regarding Dana's prior drug use. He relies on Rule 404(b) of the Texas Rules of Evidence, which provides as follows:

11

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Tex. R. Evid. 404(b).

Trial courts have discretion to admit, for a permissible purpose, relevant evidence of extraneous offenses. *See Hudson v. State*, 112 S.W.3d 794, 800-03 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("wide latitude"); *see also Wingfield v. State*, 197 S.W.3d 922, 925 (Tex. App.—Dallas 2006, no pet.) (evidence of prior instances of drug use admissible to show possession of a drug was intentional or knowing). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. We review the trial court's decision to admit evidence under an abuse of discretion standard. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010).

The Rule 404(b) list of permissible uses of "other crimes, wrongs or acts" evidence is not exhaustive. *See Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g). The evidence may be used to rebut a defense. *See Ransom v. State*, 920 S.W.2d 288, 300-01 (Tex. Crim. App. 1994) (rebuttal of defensive inference); *Hudson*, 112 S.W.3d at 800-03 (Evidence of use of knife in prior assault was admissible when defendant claimed he was delusional; defendant put his mental state at issue.). The

12

defendant may "open the door" to the evidence. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) (Defendant opened door through questions to witness.). And a witness may be cross-examined about an extraneous offense "if the extraneous offense would tend to correct the false impression left by the witness' direct examination testimony." *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002).

Insanity is an affirmative defense; therefore, the defendant has the burden to prove the defense by a preponderance of the evidence. *See* Tex. Penal Code Ann. § 8.01 (West 2011); *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008); *see generally* 6 Michael B. Charlton, *Texas Practice Series: Texas Criminal Law* § 6.2 (2d ed. 2001). A disturbance of mental capacity resulting from the voluntary introduction of any substance into the body "does not constitute a defense to the commission of a crime." *See* Tex. Penal Code Ann. § 8.04 (West 2011).

The Court of Criminal Appeals has held that, if a pre-existing mental condition does not "in and of itself" render the accused "legally insane," "then the recent use of intoxicants causing stimulation or aggravation of the pre-existing condition to the point of insanity cannot be relied upon as a defense to the commission of the crime itself." *Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex. Crim. App. 1972). In this case, defendant's expert testified without objection that taking an illicit drug like methamphetamine could render prescribed medication ineffective: "It would negate the potential benefit of taking the antipsychotic." He testified in response to defense questioning that "if a person had a

13

predisposing underlying schizophrenic illness and they used a stimulant drug such as methamphetamine, you could drive or make a[n] underlying schizophrenic illness more apparent; and you can make it worse."

On direct examination of Cashat, defense counsel asked questions concerning Dana's use of drugs:

Q. Okay. And George was -- never came back to that particular property, did he?
A. No. He had been in custody --
Q. He's been in custody --
A. -- that point until now.
Q. Okay. So, when you went back, did you find any drugs or drug paraphernalia in the house?
A. No.
Q. Did you find any stored cash anywhere?
A. No.
Q. Did you find, you know, any empty Baggies that might have been used for drugs?
A. No.
Q. When you moved out of the house, did you clean out the house?
A. For the most part, yes. My mother and my sister was there with me packing and getting things also.
Q. To the best of your knowledge, did you or your mother or sister find any drugs?
A. No.
Q. Hidden cash?
A. (Shakes head back and forth.)
Q. Baggies?
A. (Shakes head back and forth.)
Q. You've got to answer out loud so she can hear you.
A. No.
Q. So, as far as you observed and as far as you are aware, George had not taken any drugs that night.
A. No.
Q. And there were no drugs left in the house?
A. No.

Q. And he never came back to the house to cover up the tracks of the drugs that --

A. He wouldn't have been able to.

Q. Okay. And during that week leading up to March the 5th, you didn't observe him partaking in any drugs?

A. No. He -- he pretty much stayed right by my side. And Loran's taking care of me, because I was so sick, and taking care of Loran.

Q. And he was taking, though, the Paxil that doctor -- not doctor -- Nurse Scoggins had provided?

A. Yes.

The impression left by this testimony is that the only drugs Dana could have taken were prescription drugs, because otherwise Cashat would have found evidence of other drugs. This questioning invited cross-examination about why she might look for evidence of illicit drug use. The impression left by her testimony on direct examination was that she had attempted to assist Dana in obtaining medical care, she was a responsible person, and she assured herself after the incident that he had not somehow obtained illicit drugs without her knowledge. Yet, they "did drugs together" -- methamphetamine -- only a few months before the stabbings. The trial court could reasonably determine that her direct testimony left a false impression, and that the State should be permitted to cross-examine her concerning her and Dana's drug use together. And the trial court had discretion to conclude the defense had "opened the door" or invited cross-examination concerning Cashat's knowledge of Dana's drug use.

More directly, the jury could reasonably infer from Cashat's testimony that Dana had recent access to methamphetamine. Recent access made it more probable that he used the drug, considering other admitted evidence of his prior treatment for polysubstance

15

dependency and organic mental disorder secondary to methamphetamine use. The jury heard testimony that Cashat told her sister that Dana was "on something." The jury heard evidence that on the night of the stabbings Dana appeared to be "real high up on something" and looked like a "speed freak." The trial judge could reasonably conclude Cashat's testimony that they had used methamphetamine together a few months prior to the stabbings tended to make voluntary intoxication on the night of the incident "more probable" "than it would be without the evidence." *See* Tex. R. Evid. 401; Tex. Penal Code Ann. § 8.04; *see also Evilsizer*, 487 S.W.2d at 116. Considering the expert testimony concerning the effect of methamphetamine on Dana's condition and any prescribed medication for the condition, the trial judge could also reasonably conclude that the evidence of Dana's prior use of methamphetamine tended to rebut Dana's insanity defense. *See* Tex. Penal Code Ann. §§ 8.01, 8.04. Under the circumstances, the trial court could reasonably conclude that the probative value of Cashat's testimony of drug use was not outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403.

Dana also argues that the trial court's inclusion of the voluntary intoxication instruction in the jury charge constitutes reversible error. Dana asserts that *Taylor v. State*, 885 S.W.2d 154 (Tex. Crim. App. 1994), the case on which the State relied in arguing for the inclusion of the instruction, is factually distinguishable. He argues there was "no evidence of drug use by Dana on the night in question."

16

The trial court's charge must fully instruct the jury on the law applicable to the case and apply that law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004); *see* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). A voluntary-intoxication instruction operates to inform the jury that the elements of the offense, including the requisite mental state, are not affected by evidence of intoxication, thereby making the instruction "appropriate if there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions." *Sakil v. State*, 287 S.W.3d 23, 26-28 (Tex. Crim. App. 2009); *see also* Tex. Penal Code Ann. § 8.04(a) ("Voluntary intoxication does not constitute a defense to the commission of crime.").

The jury heard testimony that Cashat said Dana "was on something" the night of the stabbings, that Cashat and Dana used methamphetamine in the past, and that Dana appeared to be "real high up on something" like a "speed freak[.]" The jury also heard expert testimony concerning the effects of methamphetamine. The trial court could reasonably conclude that a juror might believe that intoxication somehow excused Dana's actions. The trial court properly utilized the charge to prevent confusion. The inclusion of the instruction did not constitute error. Issue one is overruled.

LEGAL SUFFICIENCY CHALLENGE

Focusing on the knife, Dana in his second issue challenges the legal sufficiency of the evidence. According to Dana, the evidence was legally insufficient to prove that the

17

knife was a deadly weapon and that Dana possessed a knife. He also argues that the trial court erred in denying the motion for instructed verdict relating to the deadly weapon issue.

Dana argues the only evidence establishing that he had used the knife as a deadly weapon was the testimony of Nick May, who testified as a rebuttal witness and not during the State's case in chief. After Dana argued the evidence was insufficient because Officer Calhoun failed to write down or recall the name of the person who actually handed the officer the knife, the State called May as a witness. The trial court had the authority to allow May to testify before closing argument. *See* Tex. Code Crim. Proc. Ann. art. 36.02 (West 2007) ("The court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice."). And the State had the right to present rebuttal evidence that tended to refute the defensive theory urged by defendant. *See Blevins v. State*, 884 S.W.2d 219, 228 (Tex. App.—Beaumont 1994, no pet.).

The Penal Code defines "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2012). To be legally sufficient to sustain a deadly weapon finding, the evidence must show that (1) the deadly weapon meets the statutory definition; (2) the defendant used or exhibited the deadly weapon while committing the crime for which he was convicted; and (3) other people were actually endangered. *See*

*Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003); *see also* Tex. Penal Code Ann. § 1.07(a)(17)(B). In reviewing the legal sufficiency of the evidence, we determine whether any rational trier of fact could have found beyond a reasonable doubt that the knife was used or exhibited as a deadly weapon. *Cates v. State*, 102 S.W.3d at 738 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

Dana argues that B.L. admitted that his injuries did not cause "permanent disfigurement[,]" he did not have loss of body or organ function, and he felt like he had been punched but did not see who did it. Dana also contends the testimony showed the knife was between two and two-and-one-half inches long, and there was no testimony about the sharpness of the knife.

The jury saw a photograph of B.L.'s injury to his abdomen. B.L. testified that his hand was full of blood from holding it over the wound. The cut was four inches long. He was transported to a hospital by helicopter. He stayed at the hospital overnight and underwent surgery the next morning. Another victim at the scene, F.L., received twenty-seven stitches for the wound to his face. He suffered some hearing loss and wore an eye patch for almost two months as a result of the injury. The jury could rationally conclude that the knife in this case was a deadly weapon. *See Tucker v. State*, 274 S.W.3d 688, 691-92 (Tex. Crim. App. 2008) ("Even without expert testimony or a description of the weapon, the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used."); *Morales v. State*, 633 S.W.2d 866, 868-69

(Tex. Crim. App. 1982) (Photograph of deep slash from just underneath the victim's earlobe across her cheek to the corner of her mouth, closed by sutures, was sufficient to show that a deadly weapon was used.).

Dana argues the evidence is legally insufficient to show that he possessed the knife. Witnesses at trial testified that Dana swung at them and they received cuts. At least one person at the scene was yelling that the perpetrator had a knife. Additionally, May testified that he wrestled the knife from Dana's fist. Based on the evidence, a jury could rationally conclude that Dana possessed the knife. Dana's second issue is overruled.

GIBBS'S TESTIMONY

Dana challenges the trial court's admission of Paula Gibbs's testimony. After Gibbs testified that Cashat called her the night of the incident and told her that Dana "was on something[,]" defense cross-examined Gibbs, and then moved for a mistrial. The motion was based on a renewed objection that the entire testimony was unfairly prejudicial. The defense argued that the State failed to follow Texas Rule of Evidence 613.

Dana argues that Gibbs's testimony was offered solely to impeach Cashat's testimony and the State failed to lay the proper foundation for impeachment. But when Cashat was asked about the prior inconsistency, she did not remember having made the statement that Dana was "on something." In arguments to the trial court, Dana's counsel argued that "[s]he absolutely said, No, I did not say that." The record reveals that Cashat

20

did not unequivocally admit having made the statement. *See* Tex. R. Evid. 613(a). Cashat was told the contents of the statement and the approximate time it was made. *See id.* Dana's counsel did not object during the State's cross-examination of Cashat that the place of the statement or the "person to whom it was made" was not identified. *See id.*; Tex. R. App. P. 33.1. Dana's counsel did not object to the sufficiency of the foundation when the prosecutor told the court, immediately following Cashat's testimony, that the State would be calling an impeachment witness. Furthermore, because Dana did not request or receive a limiting instruction, Gibbs's testimony could be considered for purposes other than impeachment. *See Arana v. State*, 1 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Issue three is overruled.

ARTICLE 46C.154

In Dana's fourth issue, he argues Texas Code of Criminal Procedure article 46C.154 is unconstitutional, and that "[t]he prohibition against instructing jurors of the true consequences of finding [him] insane violates his right to a fair trial and the law should be overturned." The trial court denied Dana's request to include a jury charge instruction regarding the consequences of a jury finding of not guilty by reason of insanity.

The Texas Code of Criminal Procedure provides for certain consequences when a defendant is found not guilty by reason of insanity. *See* Tex. Code Crim. Proc. Ann. arts.

21

46C.155-.270 (West 2006). Article 46C.154, however, prohibits disclosure of these consequences to the jury, as follows:

> The court, the attorney representing the state, or the attorney for the defendant may not inform a juror or a prospective juror of the consequences to the defendant if a verdict of not guilty by reason of insanity is returned.

*See* Tex. Code Crim. Proc. Ann. art. 46C.154 (West 2006). The Texas Court of Criminal Appeals stated in *Moore v. State*, 999 S.W.2d 385, 404-05 (Tex. Crim. App. 1999), that "we have held that Article 46.03, § 1(e),[2] does not violate the Constitution and that informing the jury of the consequences of finding a defendant not guilty by reason of insanity is a policy matter exclusively within the purview of the Legislature." *Moore*, 999 S.W.2d at 404-05 (citing *Robison v. State*, 888 S.W.2d 473 (Tex. Crim. App. 1994) and *Bigby v. State*, 892 S.W.2d 864 (Tex. Crim. App. 1994)); *Zwack v. State*, 757 S.W.2d 66, 69 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd); *see also generally Shannon v. United States*, 512 U.S. 573, 584-88, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (holding federal courts are generally not required to instruct a jury concerning the consequences of a not-guilty-by-reason-of-insanity verdict).

Dana acknowledges "the status of the law on this point of error[,]" but maintains the statute "is antiquated." He contends that "jurors cannot be expected to know that

---

[2] Article 46C.154's predecessor, article 46.03, § 1(e), provided that "[t]he court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the consequences to the defendant if a verdict of not guilty by reason of insanity is returned." *See* Act of May 25, 1983, 68th Leg., R.S., ch. 454, § 2, 1983 Tex. Gen. Laws 2640, 2641, (repealed 2005).

Texas law provides for long term commitment for those found not guilty by reason of insanity." Dana maintains that "the lens through which jurors view an insanity defense" is tainted by how television and movies portray the consequences of a not-guilty-by-reason-of-insanity verdict. He argues the statute is "fundamentally flawed" and "deprives truly insane defendants of a fair trial[.]"

When confronted with an attack on the constitutionality of a statute, a court starts with the presumption that the statute is valid and that the Legislature has not acted unreasonably or arbitrarily. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). The burden rests on the individual challenging a statute to establish its unconstitutionality. *Id.*

Dana does not cite any authority establishing article 46C.154 is unconstitutional. He has not demonstrated how the application of article 46C.154 operated here to deprive him of fundamental fairness. *See Lockard v. State*, 364 S.W.3d 920, 925 (Tex. App.—Amarillo 2012, no pet.). He also has not demonstrated that the statute is unconstitutional on its face. And the Court of Criminal Appeals has rejected similar arguments. *See Moore*, 999 S.W.3d at 404-05; *see also Lockard*, 364 S.W.3d at 925 (The call for a change in policy is for the Legislature to consider.). The record reflects Dana received a fair trial. He has not overcome the presumption that the statute is valid. *See Lockard*, 364 S.W.3d at 925. Issue four is overruled. We affirm the trial court's judgment.

AFFIRMED.

_____
DAVID GAULTNEY
Justice

Submitted on September 4, 2012
Opinion Delivered December 12, 2012
Publish

Before McKeithen, C.J., Gaultney and Kreger, JJ.

24

DISSENTING OPINION

I respectfully dissent. Insanity is an affirmative defense requiring a defendant to prove the defense by a preponderance of the evidence. *See* Tex. Penal Code Ann. § 8.01 (West 2011); *Meraz v. State,* 785 S.W.2d 146, 150 (Tex. Crim. App. 1990). As a general rule, all relevant evidence is admissible. Tex. R. Evid. 402. However,

> [e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident….

Tex. R. Evid. 404(b). When the State offers evidence of an extraneous act to rebut the defense of insanity, the threshold inquiry is whether evidence of such conduct tends to prove the accused was sane when the charged offense was committed. *See Sanders v. State,* 604 S.W.2d 108, 111 (Tex. Crim. App. 1980).

The State used Cashat's testimony alleging Dana's methamphetamine use a few months prior to the date of the offense to argue that drug usage, rather than mental illness, caused Dana's paranoia on the date the offense was committed. I do not believe that Cashat's testimony regarding Dana's drug usage months prior to the offense tends to make it more or less probable that Dana was sane when the offense occurred. *See* Tex. R. Evid. 401. I also do not believe the evidence was probative of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* Tex. R. Evid. 404(b).

1

The complained-of testimony was not relevant to the material issue of whether Dana was insane on the date of the offense: it was offered to show that, because Dana had used an illegal drug months prior to the offense, he had probably ingested drugs on the day of the offense as well. I believe that the trial court's erroneous admission of this evidence affected Dana's substantial rights, and constitutes reversible error. I would sustain the portion of issue one that complains of the admission of this testimony, and reverse the trial court's judgment and remand for a new trial.

_____
STEVE McKEITHEN
Chief Justice

Dissent Delivered
December 12, 2012

2