**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00238-CR**
_____

**GERALD WILLIAM REN QUICK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 411th District Court
San Jacinto County, Texas
Trial Cause No. 12,979

**MEMORANDUM OPINION**

Gerald William Ren Quick appeals his conviction for aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann § 22.02(a)(2). In four issues on appeal, Quick complains about jury charge error and the admissibility of testimony. We affirm the trial court's judgment.

1

## BACKGROUND

On Christmas Eve 2018, Quick was on David Lewis's property with his girlfriend, Denise Martinson; some friends; and the victim, Bryan,[1] when he shot Bryan in the stomach. The property had several buildings, such as a "barndominium[,]" and livestock, including horses. Quick and Lewis were friends, and Bryan was living and working on Lewis's property. Quick and Martinson lived a mile from Lewis' property. The day before the shooting, Lewis's horses ingested "spear grass[,]" resulting in bleeding gums. Lewis asked Martinson to dispose of the spear grass, and he testified that Quick and Martinson had his permission to be on the property.

**Denise Martinson**

Martinson testified that on the day before the shooting, Bryan asked her to look at one of Lewis's horses because "[the horse] looked terrible[,] [and] [t]here was blood [and] saliva [coming] out of her mouth." Martinson stated she has taken care of horses her entire life and had cared for Lewis's horses many times. On the day of the shooting, Martinson took the injured horses to the veterinarian, who

---

[1] We refer to the victim by a pseudonym to conceal his identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]").

confirmed they had ingested spear grass from contaminated hay. The veterinarian told Martinson to burn the hay to avoid further injury and contamination.

According to Martinson, Bryan did not agree to burn the hay and planned to cover the hay with a tarp. Martinson testified that upon learning the hay was not covered, Quick became "loud and frustrated[,]" but did not threaten anyone. Martinson explained that when she approached Bryan in the barndominium about the hay, Bryan started "yelling[,]" "cursing[,]" and "spitting[,]" at her. Martinson's friend, Adrienne Patton, joined the argument with Bryan, which only lasted a "couple of minutes[,]" after which, Martinson and Patton went to get their "stuff and get out." Martinson described the exchange with Bryan as "crazy" and explained she was "very afraid."

After learning about Martinson's and Bryan's confrontation, Quick went into the barndominium. Martinson heard Quick and Bryan "[y]elling," and observed Bryan "throw [Quick] into the wall across from the bathroom." According to Martinson, Quick drew his firearm, and Bryan retreated down the hallway, after which, Quick "reholstered his gun." Martinson explained that Bryan then turned and "lunge[d] right back[]" at Quick. Martinson observed Bryan hit Quick several times causing him to hit the ground. At that point, Quick pulled out his gun again, "but he really never aimed[,]" and as "[Bryan] is lunging at him, [Quick] shoots." During

3

the altercation, Martinson did not observe Quick "swing" or hit Bryan. She testified that Quick backed up from Bryan during the entire altercation.

**Adrienne Patton**

Patton testified she was with Martinson on the day of the shooting. Patton explained that Bryan told Martinson about the injured horse. Patton testified that there was no animosity between Martinson and Bryan that day, but two days prior, Quick said "that [Bryan] needs to get his ass kicked, and that he needs a beating." Patton testified that Quick had a lot of "anger and rage" towards Bryan "in general[.]" The day before the shooting, Patton heard Quick on speakerphone, and she testified that he was "more enraged, more angry, and something needed to happen."

Patton explained that on the day of the shooting, she and Martinson took the injured horses to the veterinarian, who determined that the horses ingested spear grass from contaminated hay, and the veterinarian advised Martinson to destroy the hay. Patton said that it was discussed with Bryan that the hay needed to be destroyed or locked away, but Bryan was not cooperating. She explained that she, Martinson, and Quick were "frustrated[.]" Patton testified that on their way back from the veterinarian, she heard a speakerphone conversation between Martinson and Quick. She described Quick as "very, very angry" and stated [Quick] was going to burn the hay after dark. According to Patton, Quick said that "[Bryan] needs to either help or,

4

you know, if he gets in the way he's going to be -- yeah. He was very angry and, again, repeated some of those -- his anger towards him about -- that he basically needs a beating[.]"

When they got back, Martinson went "straight back to confront [Bryan[,]" who was in the back of a garage, which included a kitchen. Patton described Bryan's and Martinson's argument as "excited" and that they were exchanging "[a]ngry words[,]" but denied that Bryan was physical with Martinson. Bryan told Martinson that the "horses were none of his business, it wasn't his job, it's not what [Lewis] was paying him to do, and to leave him alone about it."

When Quick entered the kitchen, Martinson told Quick about her argument with Bryan, and Quick was "very angry[,]" and headed "straight out to the back garage." Patton heard Quick and Bryan arguing about the horses, and while she did not see Quick or Bryan throw punches, she testified there was "definitely jostling." Patton denied that Bryan had a weapon and testified that "[b]efore [Quick] had exited the hallway and before they came into the main area, I saw that [Quick] had drawn his gun." As the argument escalated, Patton stated that Bryan and Quick punched each other, and that it was "sort of a punch/trip/fall on [Quick's part,]" and Quick "hit the back wall and he sort of half fell." Quick then stood up and shot Bryan, who ran out the back door. Patton described Quick as in "shock" after he shot Bryan and that he was "babbling, you know, [t]his is bad. I messed up. He's dead. He's dead.

5

He kept claiming that [Bryan] was dead." Patton testified she called 911, and Quick asked Martinson to call his lawyer.

**Bryan**

Bryan testified he works for Lewis as a warehouse assistant. On the day of the shooting, he had been living in a home on Lewis's property for about five months. Prior to the shooting, Bryan did not have any problems with Martinson or Patton, and he knew Martinson and Quick as "acquaintance[s][.]" Bryan explained that his main job was taking care of Lewis's horses, and that there had not been any previous issues about their care. Bryan testified that his responsibility included "send[ing] [Lewis] photographs of the bale and [Lewis] would tell me when it was appropriate to put out another bale[,] [a]nd then I fed them a grain material and alfalfa everyday." When Bryan previously told Lewis about spear grass in the hay, Lewis told him to "feed them what we have." Bryan could not transport the horses or their feed because his truck was too small.

On the day of the shooting when Lewis asked Bryan to take the horses to the veterinarian, they decided that Martinson and Quick would take them. After returning from the vet, Martinson and Patton approached Bryan and "kind of lashed into me." Bryan stated the argument lasted "five to eight minutes[,]" and he denied it was physical. According to Bryan, he disengaged from the argument and returned to the garage, and then Quick entered the garage "drunk and armed." Bryan testified

6

that he smelled alcohol on Quick's breath, explaining Quick was "spitting in my face[]" and "was close enough for me to smell his breath." According to Bryan, Quick repeatedly cursed at him, and he got "tired of arguing with [Quick]" and "just shut it down." Bryan testified "I was doing my job. I didn't want any part of it. I didn't want a confrontation."

Bryan testified that when he went into the bathroom to retrieve his cell phone to call Lewis, Quick followed and continued to curse at him. Bryan said that Quick hit him first, and he "defended [him]self." He testified that Quick ran down "the hallway to go outside the tractor garage, like he was running to the door[,] and I caught him at the door." Bryan described the shooting as follows:

> They have a saying: Everybody has a plan until you get shot. There was no plan. I just assumed -- so I never -- all right. So[,] when he turned at the door, I hit him, he shot me, he fell, but like he fell in a sitting position. And honestly, I thought that I knocked him out. But I physically never looked at his face because I was afraid of what I would do. So[,] when I struck him, I looked down and I saw the hole in my shirt and I said, Fuck. I just ran. I didn't think twice. I thought I was dead. I really thought I was dead, so. But I run down the hallway out the…garage out under the awning and all the way -- I ran to [the neighbor's] house.

On cross-examination Bryan denied telling the police or Lewis's neighbor he was "beating [Quick's] ass."

Several other witnesses testified at trial, including law enforcement officers and personnel who testified about the 9-1-1 call and their investigation. The jury found Quick guilty of aggravated assault with a deadly weapon, assessed his

punishment at five years of imprisonment, suspended his sentence and placed Quick on community supervision for five years, and assessed a $5,000 fine.

## ISSUES

The Appellant's Brief indicates he raises four issues which Appellant states are as follows: 1. The trial court reversibly erred by not sustaining the Appellant's objections to the jury instruction under TEX. PEN. CODE § 46.02; 2. The trial court erred by not sustaining the Appellant's objections to the jury instruction under TEX. PEN. CODE § 49.01(2)-Voluntary Intoxication; 3. The trial court erred by not sustaining the Appellant's objection to the jury instruction of provocation; and 4. The trial court erred in allowing the testimony of Adrienne Patton to be admitted into evidence. In his argument as to issue one, he alleges he had permission from the property owner to be on the property and the trial court "reversibly erred" in submitting an instruction based on TEX. PEN. CODE § 46.02. On his second issue, he argues the trial court erred in overruling his objection and submitting an instruction about voluntary intoxication. As to his third issue, he does not make any argument in his initial brief to support his stated issue but in his reply brief he argues the trial court erroneously gave the jury a "provocation" instruction and that there was "no competent, admissible evidence adduced at trial that the Appellant was the aggressor concerning this incident." On the fourth stated issue, Appellant argues,

> All of the evidence submitted to the jury shows that the trial court erred
> in allowing the hearsay statement of Adrienne Patton to be admitted

8

into evidence. Ms. Patton's statement was not based upon her personal knowledge and/or observation. Instead, her statement was gleaned from information given to her by the San Jacinto District Attorney's Office. Further, the statement was not an admission by a party opponent and was inadmissible hearsay.

## STANDARD OF REVIEW

In his first three issues, Quick challenges the trial court's instructions in the jury charge. The trial court's charge must fully instruct the jury on the law applicable to the case and apply that law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004); *see* Tex. Code Crim. Proc. Ann. art. 36.14. Our review of a purported jury charge error involves a two-step process. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *see Barron v. State,* 353 S.W.3d 879, 883 (Tex. Crim. App. 2011). First, we must determine whether error exists, and second, we must determine whether sufficient harm resulted from the error to warrant reversal. *See Barron*, 353 S.W.3d at 883 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *see also Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If no error occurred, our analysis ends. *See Kirsch*, 357 S.W.3d at 649.

Whether the error was preserved in the trial court determines the degree of harm required for reversal on appeal. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza*, 686 S.W.2d at 171). If error was preserved by objection at trial, to

9

obtain a reversal it requires a showing of "'"some harm[.]'" *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (quoting *Almanza*, 686 S.W.2d at 171). "For both preserved and unpreserved charging error, 'the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole.'" *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995) (en banc).

If the error was not preserved by objection at trial, to obtain a reversal it requires proof of fundamental harm that was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal*, 453 S.W.3d at 433. In assessing the degree of harm, we must consider the entire jury charge, the evidence, the argument of counsel, and any other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171. We examine the charge in its entirety rather than a series of isolated statements. *Holley v. State*, 766 S.W.2d 254, 256 (Tex. Crim. App. 1989); *Iniguez v. State*, 835 S.W.2d 167, 170 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). "'[E]gregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis.'" *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011) (citation omitted). "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction

clearly and significantly more persuasive." *Id.* at 490. An appellant must have suffered actual harm, not merely theoretical harm. *See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) (citing *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986)).

## ANALYSIS

Section 46.02 Instruction

In issue one, Quick complains the trial court erred by including a jury instruction on Penal Code section 46.02. *See* Tex. Penal Code Ann. § 46.02 (Unlawful Carrying Weapons). Because at trial Quick claimed that he was justified in using a weapon in his use of force and he argued he had the right to stand his ground on premises under his control, the State requested a jury instruction that would defeat his claim if the jury found that he was not on his premises or in control of the premises. Quick contends that Lewis testified that Quick had consent to be on Lewis's property and that the evidence shows Quick had control over the premises. On appeal, the parties dispute Quick's level of control over Lewis's property.

Quick filed objections to the State's proposed jury charge, including an objection to the instruction on section 46.02 concerning the unlawful possession of a firearm. Quick argued at trial that section 46.02 was inapplicable to preclude his justification for self-defense because he had control over the premises. During trial, Quick objected to the inclusion of a section 46.02 instruction, and the State argued

that Quick was unlawfully carrying a weapon when the offense occurred because "[i]t wasn't his house[.]" The record shows the trial court discussed with the parties that it was a question of fact for the jury to determine whether Quick had permission to come over that day and whether Quick was in violation of the law. Quick then withdrew his objection to the section 46.02 instruction:

> LEAD PROSECUTOR: I think that's a question of fact for the jury to determine. Mr. Lewis was not there that day. There is no saying that he gave him permission to come over that day while he was angry with the victim in this case. So I think that's an issue for the jury to decide.
> DEFENSE COUNSEL: The other part of our argument -- were you done?
> LEAD PROSECUTOR: I am.
> DEFENSE COUNSEL: -- is that there was no discussion of my client being in possession of an unlawful firearm. Wasn't charged with it, wasn't arrested for it. Statute was run on it. And the first we heard about it was Mr. [SECOND PROSECUTOR] saying something about it last week. And so I don't think that there is evidence that he was in violation of the law based on the testimony that we have heard so far, other than he didn't have a CHL.
> THE COURT: Now, is that a fact issue for the jury to decide?
> LEAD PROSECUTOR: Yes.
> SECOND PROSECUTOR: Yes.
> *DEFENSE COUNSEL: We'll withdraw that objection.*
> THE COURT: Okay. We will let the jury decide. I have an opinion about it, but it's for the jury to decide. (emphasis added)

When a party states on the record that he "withdraws his objection" without obtaining a ruling from the court, generally he is estopped from asserting a claim of error on appeal. *See Ruffins v. State*, 666 S.W.3d 636, 642-43 (Tex. Crim. App. 2023) (Under the general principle of estoppel, "a party may be estopped from asserting a claim that is inconsistent with that party's prior conduct." Citing *Arroyo v. State*, 117 S.W.3d 795, 798 (Tex. Crim. App. 2003)).

12

Turning to the first prong of *Almanza*, we determine whether error exists in the charge. *Ngo v. State,* 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005). Section 46.02 of the Penal Code states:

(a) A person commits an offense if the person:

    (1) intentionally, knowingly, or recklessly carries on or about his or her person a handgun;

    (2) at the time of the offense:

        (A) is younger than 21 years of age; or
        (B) has been convicted of an offense under Section 22.01(a)(1), 22.05, 22.07, or 42.01(a)(7) or (8) committed in the five-year period preceding the date the instant offense was committed; and

    (3) is not:

        (A) on the person's own premises or premises under the person's control; or

        (B) inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control.

Tex. Penal Code Ann. § 46.02. The jury instruction stated:

You are instructed that the use of force against another is not justified if the defendant sought an explanation from or discussion with the other person concerning the defendant's differences with the other person while the defendant was carrying a weapon in violation of Penal Code Section 46.02.

Penal Code Section 46.02 states, []A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his person a handgun or club, if the person is not l) on the person's own premises or premises under the person's control; or 2) inside of or

13

directly in route to a motor vehicle or watercraft that is owned by the person or under the person's control.

The jury charge also instructed the jury on the law of self-defense and the use of deadly force. Section 9.31 of the Penal Code provides that a defendant is justified in using force when he has a reasonable belief that it is immediately necessary to protect himself from another person's use of unlawful force. *Id.* § 9.31(a). A defendant is justified in using deadly force when he is justified in using force under section 9.31 and has a reasonable belief that it is immediately necessary to protect himself from another person's use of unlawful deadly force. *Id.* § 9.32(a). An exception to this justification exists when the defendant "sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was . . . carrying a weapon in violation of Section 46.02[.]" *Id.* § 9.31(b)(5)(A). A charge limiting a defendant's right to self-defense is proper when (1) self-defense is an issue; (2) there are facts in evidence showing the defendant sought an explanation from or discussion with the victim concerning their differences; and (3) the defendant was unlawfully carrying a weapon. *Guilbeau v. State*, No, 01-08-00038-CR, 2009 WL 1086947, at \*\*3-5 (Tex. App.—Houston [1st Dist.] Apr. 23, 2009, pet. ref'd) (mem. op., not designated for publication); *Lee v. State*, 259 S.W.3d 785, 789 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). If evidence raises the issue, an instruction should be submitted. *See Bumguardner v. State*, 963 S.W.2d 171, 175 (Tex. App.—Waco 1998, pet. ref'd) (citation omitted).

14

Lewis testified that Bryan worked and lived on his property, and while Lewis was out of town during Christmas 2018, Lewis understood that Bryan would take care of his property and feed the horses. Lewis testified that Quick did not live on his property, but Lewis said he asked Martinson to dispose of the spear grass and she agreed. Lewis also testified that he gave Quick and Martinson permission to be on his property. Bryan testified that he lived on Lewis's property, worked as a warehouse assistant, and mainly took care of Lewis's horses. Martinson and Patton testified that Quick drew his firearm when he confronted Bryan. Patton also testified that Bryan told Martinson that the "horses were none of his business, it wasn't his job, it's not what [Lewis] was paying him to do, and to leave him alone about it."

Quick argues he was not unlawfully armed because he was in control of the premises when he confronted Bryan. Our review of the record shows there was conflicting evidence about whether Quick was "in control" of Lewis's property when he sought out Bryan for an explanation or discussion concerning his differences with Bryan while Quick was carrying a handgun. *See Guilbeau*, 2009 WL 1086947, at **3-5; *Lee*, 259 S.W.3d at 789; *see also Fink v. State*, 97 S.W.3d 739, 741, 743-44 (Tex. App.—Austin 2003, pet. ref'd) (concluding trial court did not err by submitting an instruction limiting appellant's right to self-defense where there was conflicting evidence from which a rational trier of fact could conclude beyond a reasonable doubt that appellant was not a resident of the apartment and

15

sought an explanation or discussion while unlawfully carrying a handgun). Given the conflicting evidence about who was "in control" of the premises when the shooting occurred, the jury could have weighed the evidence and believed some, all, or none of the testimony and reasonably conclude that Quick was carrying a weapon in violation of section 46.02. *See Guilbeau*, 2009 WL 1086947, at **4-5; *Lee*, 259 S.W.3d at 789; *Fink*, 97 S.W.3d at 744. Since there was evidence from which a rational trier of fact could conclude beyond a reasonable doubt that Quick violated section 46.02, we conclude the trial court did not err by submitting a section 46.02 instruction to the jury. *See Fink*, 97 S.W.3d at 744; *Bumguardner*, 963 S.W.2d at 175. Having determined the instruction was proper, we need not review the second *Almanza* prong for harm. *See Ngo,* 175 S.W.3d at 744; *Almanza,* 686 S.W.2d at 171. We overrule issue one.

Voluntary Intoxication

In issue two, Quick challenges the jury instruction on voluntary intoxication. The record shows Quick objected to the voluntary intoxication instruction under Rule 403, Tex. R. Evid., and because there was no expert testimony as to intoxication.[2] Turning to the first prong of *Almanza*, we determine whether error exists in the charge. *See Ngo*, 175 S.W.3d at 744.

---

[2] Appellant's brief contains complaints that were not raised at trial, including complaints based upon Texas Rules of Evidence 401, 402, 403, and 702, as well as alleged non-specific violations of Equal Protection and Due Process under the

A voluntary-intoxication instruction informs the jury intoxication is not a defense to the commission of a crime, and it is "appropriate if there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions." *Sakil*, 287 S.W.3d at 26 (citation omitted); *Fisher*, 397 S.W.3d at 746; *see* Tex. Penal Code Ann. § 8.04(a). Texas Penal Code section 8.04(a) states:

> (a)  Voluntary intoxication does not constitute a defense to the commission of crime.
>
> . . .
>
> (d) For purposes of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

Tex. Penal Code Ann. § 8.04(a), (d). The trial court included the following instruction:

> Voluntary intoxication is not a defense to the commission of a crime. "Intoxication" in this context means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

Quick argues that the trial court erred by including the instruction because law enforcement never tested his blood or breath and because there was no reliable scientific expert evidence adduced at trial that he was intoxicated. In this context,

---

United States Constitution's Fourteenth Amendment and the Texas Constitution, Art. I, Sections 3 and 19. As those objections were not raised at trial, they will not be considered here. *Hughes v. State*, No. PD-0164-22, 2024 Tex. Crim. App. LEXIS 402, at *18 (Tex. Crim. App. May 22, 2024).

17

the State was entitled to the instruction if there is some evidence of intoxication sufficient to raise the issue and require a voluntary intoxication instruction. *See Taylor v. State*, 885 S.W.2d 154, 157-58 (Tex. Crim. App. 1994). "[I]f there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions, an instruction [pursuant to Section 8.04(a)] is appropriate."). *Id.* at 158; *see Dana v. State*, 420 S.W.3d 158, 168 (Tex. App.—Beaumont 2012, pet. ref'd). The jury heard testimony from Bryan that Quick was "drunk and armed[,]" and although he did not see Quick drink that day, Bryan testified that he was close enough to Quick to "smell it on his breath." The trial court could reasonably conclude that a juror might believe that intoxication somehow excused Quick's actions such that the instruction was necessary to guide the jury in its deliberations. Tex. Code Crim. Proc. Ann. art. 36.14; *Taylor*, 885 S.W.2d at 158.

We conclude the trial court properly included the instruction because there was some evidence of intoxication sufficient to raise the issue. *See Sakil*, 287 S.W.3d at 27-28; *Fisher*, 397 S.W.3d at 746; *Taylor*, 885 S.W.2d at 157-58; *Dana*, 420 S.W.3d at 168. Having concluded that the instruction on voluntary intoxication was proper, we need not review the second *Almanza* prong for harm. *See Ngo*, 175 S.W.3d at 744; *Almanza*, 686 S.W.2d at 171; *Fisher*, 397 S.W.3d at 746. We overrule issue two.

Provocation Instruction

In issue three, Quick argues the trial court erred by submitting a provocation instruction because there was no admissible evidence showing he provoked the incident. Prior to trial, Quick filed an objection to the following instruction on provocation:

> [] Another qualification on the law of self-defense is that the defendant's use of force is not justified if the defendant provoked the other's use or attempted use of unlawful force, unless the defendant abandons the encounter, or clearly communicates to the other person his intent to do so reasonably believing he cannot safely abandon the encounter, and the other nevertheless continues or attempts to use unlawful force against the defendant. To prove the defendant provoked the other, the State must show that:
>
> 1. The defendant did some acts or used some words that caused the other person to attack the defendant; and
>
> 2. The defendant's acts or words were reasonably calculated to provoke the attack;
>
> 3. The defendant did the acts or used the words for the purpose and with the intent that the defendant would have a pretext for inflicting harm on the other person.

The record shows that during trial, defense counsel reiterated the objection to the provocation instruction, and the trial court sustained the objection and noted there was no evidence that Quick provoked Bryan to attack him so Quick would have a pretext for inflicting harm on Bryan. The jury charge given to the jury in this case did not include the provocation instruction that Quick objected to at trial. We conclude Quick failed to show error in the jury charge. Since there was no error, we

19

need not review the second *Almanza* prong for harm. *See Ngo,* 175 S.W.3d at 744; *Almanza,* 686 S.W.2d at 171. We overrule issue three**.**

Admissibility of Testimony

In issue four, Quick argues on appeal that the trial court erred by admitting Patton's testimony regarding statements Quick made about Bryan before the shooting. Quick argues "[t]he testimony . . . was not a specific threat, only showed frustration with [Bryan,] and did not meet the evidentiary threshold as a declaration against interest, as required by [Rules of Evidence] 801(d) and 802."

At trial, Quick objected that Patton's testimony concerning alleged threats and statements Quick made about his frustration with Bryan, about his anger toward Bryan, and about Bryan needing a "good beating" were hearsay. The State argued that Bryan's statements were not hearsay, because they were admissions by a party-opponent and declarations against interest. In a voir dire examination outside the jury's presence, Patton testified that the statements were made by Quick in her presence in the days before the shooting, Quick was "angry" with Bryan, that he did "not like [Bryan,]" and threatened that Bryan needed a "good beating[.]" Patton testified that she heard that language from Quick regarding Bryan "every day I was there[.]" On the day of the shooting, Patton heard Quick on the phone with Martinson and she testified "[Quick] was very angry and enraged that [Bryan] wasn't helping with the hay and he said that [Bryan] better help or get out of the way. And he just,

20

again paraphrasing, was aching for a beat-down, basically." At the end of voir dire, the State argued that Patton's testimony was admissible as admissions and statements against interest. The trial court overruled the objection and allowed Patton to testify regarding Quick's statements about Bryan.

We review the trial court's decision to admit or exclude evidence of a statement against interest under an abuse of discretion standard. *Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999); *Walters v. State*, No. 09-19-00388-CR, 2021 WL 5498213, at *1 (Tex. App.—Beaumont Nov. 24, 2021, pet. ref'd) (mem. op., not designated for publication). Rule 803(24) provides that, under certain circumstances, a statement made against a declarant's interest is not excluded by the hearsay rule. *See Coleman v. State*, 428 S.W.3d 151,158 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). But we need not address whether Quick's statements meet the requirements of Rule 803(24), because the trial court reasonably could have concluded that Quick's statements were not hearsay under Texas Rule of Evidence 801(e)(2)(A). "Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay. . . . And we note that party admissions, unlike statements against interest, need not be against the interests of the party when made; in order to be admissible, the admission need only be offered as evidence against the party." *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999).

We conclude the trial court did not abuse its discretion by admitting Patton's testimony regarding Quick's statements about Bryan. We overrule issue four.

## CONCLUSION

Having overruled all of Quick's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on March 5, 2024
Opinion Delivered August 7, 2024
Do Not Publish

Golemon, C.J., Johnson and Wright, JJ.