Jane Bland, Justice
Percy Hines was indicted for murder. See TEX. PENAL CODE § 19.02(b). Hines waived a jury and pleaded not guilty. The trial court found Hines guilty and sentenced him to 45 years' confinement.
On appeal, Hines contends that (1) the evidence is insufficient to support the trial court's implicit rejection of his defenses of legal insanity and self-defense; and (2) the bill of cost's imposition of a statutory "Summoning Witness/Mileage" fee violates the Texas Constitution and should be deleted from the judgment. We affirm.
*299 BACKGROUND
A. Interaction between Hines and the complainant
Hines and John Chime first became acquainted in the early 1990s when they dated two sisters. Years later, in 2004, Chime loaned Hines money. Hines described Chime as "sort of like a loan shark." Chime held car titles as collateral until loans were repaid and was known to shoot at some debtors' houses.
Two years later, Hines had not repaid Chime for the loan. Chime began calling Hines and making vague threats. Hines left Houston to live with his parents in Lubbock. In 2009, Hines returned to Houston. He began to make payments on the debt, but by November 2010, he had not fully repaid it.
A few days before Thanksgiving that November, Chime called Hines and demanded the money Hines owed him. When Hines told Chime that he didn't have any money, Chime became threatening. He told Hines that he was on his way to Hines's apartment. A short time later, Chime arrived at Hines's condo complex and parked his truck in the condo parking lot. Hines saw Chime sitting in the truck. Hines was holding a .38 caliber handgun with a potato placed over the barrel. Hines later explained that the potato was supposed to work like a silencer. He concealed the gun behind his back and approached Chime's truck.
Chime was sitting with his hand by his side where Hines could not see it. Hines asked Chime what he had in his hand, and Chime responded by asking Hines what Hines was holding. According to Hines, Chime began to talk about a type of handgun that was used by the military during the first Gulf War. Hines saw Chime move, and at that point, Hines shot Chime three times, killing him.
Hines ran from the truck. He stopped and returned to the truck when he realized that Chime was not shooting back at him. On his return, he saw Chime's lifeless body. He pushed the body to the passenger side of the truck and drove it to the unoccupied house of a relative who had died earlier that year. Hines went into the house and pondered what to do next. By the time he left the house, night had fallen. Hines drove the truck back to his apartment complex. Then, sometime later, Hines drove it to a strip center on West Orem Drive in Southwest Houston, close to Chime's neighborhood. He left the unlocked truck in the parking lot, with Chime's body inside.
B. Investigation of the murder
Approximately one week later, the police were called when fluid from Chime's decomposing body could be seen leaking from the abandoned truck. Houston Police Department Officer A. Palatino, then assigned to the Crime Scene Unit, processed the truck for evidence. Two days after the initial processing, Officer Palatino was asked to process the truck again, this time to look for bits of potato. She found a substance that looked like it could have been shriveled-up pieces of potato scattered throughout the car. Testing confirmed them to be potato pieces with gunshot residue on them.
On November 29, investigators discovered that Chime's bank account showed suspicious retail purchases made near the time of Chime's death. Investigators obtained a surveillance tape from one of the stores, which showed a man who appeared to be Hines making a purchase. Later that afternoon, the investigators obtained and executed a warrant for Hines's arrest.
Detective R. Chappell conducted a series of three custodial interviews with Hines, the first of which took place immediately after his arrest. Hines stated a few *300 times that he was afraid of Chime. Hines mentioned potatoes during the first two interviews. Detective Chappell did not understand Hines's reference until after the second interview, when another homicide investigator told him about the urban legend that a potato can be used as a silencer.
On the day of the third interview, Detective Chappell went to the condo complex where Hines's father, who was visiting, gave the officers consent to search his Lexus. He explained that he let Hines use the Lexus when Hines was living in Lubbock. After Hines's last visit, he let Hines drive it to Houston to have it repaired and had come to take his car back to Lubbock. In the Lexus, the officers found a bag on the floorboard. It contained a pistol that was later confirmed to be the gun used to kill Chime. A computerized search for the pistol's serial number led to the discovery of a 2006 police report stating that Hines was found in possession of the same gun in that incident.
In the third interview, Detective Chappell showed Hines pictures of his father's Lexus, pictures of the pistol, and a document Chappell had printed from the internet explaining how to use a potato as a silencer. At that point, Hines refused to cooperate further.
C. Proceedings in the trial court
In October 2011, before the first trial setting, the court found Hines was incompetent to stand trial. He was committed to a state hospital and discharged in February 2012, when he was found competent to stand trial. Hines raised the defenses of legal insanity and self-defense. During trial, Hines adduced evidence of a 1998 Harris County District Court judgment finding him not guilty by reason of insanity on a retaliation charge.
Dr. Coates testified as the State's expert psychologist. In his meeting with Hines, Hines appeared polite, cordial, and seemed willing and able to describe his recent experiences, his concerns, and events that occurred around the time he killed Chime, as well as his state of mind at the time. Dr. Coates observed that Hines was able to effectively communicate with him.
Hines denied experiencing severe psychiatric symptoms, such as a loss of reality, or the type of delusions or hallucinations that would come with psychosis. He told Dr. Coates about the unsettled debt he had with Chime. Hines told Dr. Coates that, on the night he killed Chime, Chime had called and threatened Hines, although he did not explicitly threaten to kill him. Hines explained that he was focused on protecting himself when he met with Chime because he was afraid of Chime. He told Dr. Coates that he shot Chime in self-defense.
Hines was tearful and appeared regretful as he described his thought process after killing Chime. Dr. Coates recounted that
[Hines] considered hiding the truck in a park. He considered burning the truck and burning the DNA-or burning the DNA in the truck, but he said he changed his mind because he knew that was a crime, arson. And he said that if he did something else with [Chime's body], it would be something else against Hines. And he said: I was-I was-I didn't feel like I was going to have much luck with the legal situation. Ultimately, he decided, as he put it, to leave the vehicle where he thought somebody would be able to find it quickly so that [Chime's] body would be able to have some hope of being displayed in an open casket at a funeral. And so, he said, he chose a neighborhood that was close to a house that he built and that was close to the high school he graduated from.
*301 Based on his review of Hines's medical records, the videotaped police interrogations, and this interview, Dr. Coates opined that any mental illness symptoms that Hines experienced at the time he killed Chime did not render him unable to know that murder was wrong.
The State also introduced testimony from its expert psychiatrist, Dr. Andrea Stolar. She reviewed Hines's medical records and then viewed the interrogations. She also conducted a five-hour interview of Hines. Dr. Stolar noted Hines's bipolar diagnosis and observed that he had wide variations in demeanor throughout the interview. Dr. Stolar found Hines knowledgeable about his legal situation and noted that he had good insight into his mental illness.
Hines was evasive about whether he had killed Chime and did not provide any details about the events leading to Chime's death. He told Dr. Stolar, however,
If I would have murdered John Chime, once you get a body to a second location half your work is done. You're most in danger of being caught at the scene, so you want to get the body to a second location and get rid of the body where it could not be found. The truck would have been burned to remove DNA evidence and whatever weapon was used would have been removed. If I murdered someone it would have been hard to find the body. If you murder someone and get caught you're going to be convicted.
When Dr. Stoler asked Hines why he would have taken those actions, Hines responded, "There is no time in my life that I wake up in the morning that I don't know that murdering someone is a crime. My level of mental illness doesn't get to the level where I don't know that...."
Dr. Stolar opined that, although Hines has a mental illness, he was aware of the wrongfulness of his conduct when he killed Chime. She based this opinion on four findings:
• Hines did not report experiencing symptoms of his bipolar disorder that would have caused him not to know the wrongfulness of his actions at the time, and no records indicate otherwise. Hines claimed he was compliant with prescribed medications, successfully defended himself in a lawsuit, and provided information during a business in which he was involved.
• Hines denied threatening to kill another person earlier on the same day Chime was shot, saying that he would not threaten the person because he wanted to avoid arrest. This rationale shows that Hines knew at the time that threatening Chime was a criminal offense.
• Hines was not willing to discuss the details of Chime's death with Dr. Stolar and denied guilt. Certain details from the crime scene, however, indicate efforts to conceal evidence, and Hines's explanation of how he would have hidden the body if he had killed Chimes indicates an understanding of the wrongfulness and criminality of the alleged offense.
• Hines did not suggest, and Dr. Stolar found no information to support, that Hines had any psychotic motivation for killing Chime. The reported dispute between Hines and Chime about repayment of the loan provides a rational basis for any potential altercation.
Dr. George Glass, the defense expert, interviewed Hines twice. As to Hines's mental state on the day he killed Chime, Dr. Glass noted that, while Hines already considered Chime a threat and was anxious *302 about owing him money, several other factors heightened Hines's anxiety that day. Hines had argued with his father shortly before his confrontation with Chime. Also, firefighters had broken Hines's front-door lock while extinguishing a recent kitchen fire, so that Hines could not secure his unit. Hines told Dr. Glass that he had not slept in the four days before the homicide. Dr. Glass additionally considered that Hines may not have been taking his prescribed medication, noting that the officers who searched Hines's condo did not find any medication.
Dr. Glass also pointed to the stories Hines told him during the interviews about having had an opportunity to participate in professional football and other professed accomplishments, describing them as delusional. In reviewing Hines's medical records, Dr. Glass noted that at different times, Hines had been declared competent and incompetent, sometimes by the same physician. Dr. Glass interpreted these inconsistencies as showing a pattern that demonstrated Hines's lack of sanity: Hines would have a crisis that resulted in incarceration or institutionalization and would show some improvement in a controlled setting on medication but would fall back into psychosis after release. Based on the interviews and his medical records review, Dr. Glass opined that at the time Hines shot Chime, Hines was "insane" and "was [not] thinking about" whether shooting Chime was right or wrong.
DISCUSSION
I. Standard of Review for Sufficiency Challenges
In reviewing Hines's challenges to the sufficiency of the evidence supporting the rejection of his defenses of legal insanity and self-defense, we apply the legal standard for sufficiency of the evidence articulated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See Gear v. State , 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) ; Pena v. State , 441 S.W.3d 635, 640 (Tex. App.-Houston [1st Dist.] 2014, pet. ref'd). Under this standard, we consider the evidence in the light most favorable to the verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson , 443 U.S. at 318-19, 99 S.Ct. at 2788-89 ; accord Gear , 340 S.W.3d at 746. We may not substitute our judgment for that of the factfinder by reevaluating the weight or credibility of the evidence; instead, we defer to the factfinder's responsibility to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. Isassi v. State , 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) ; Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).
II. Legal Insanity
Hines contends that the evidence is legally insufficient to support the trial court's implicit rejection of his legal-insanity defense. A defendant cannot be convicted of a criminal offense if he is legally insane at the time of the crime. TEX. PENAL CODE § 8.01(a) ; Dashield v. State , 110 S.W.3d 111, 113 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd) (en banc). The standard for legal insanity is whether "at the time of the conduct charged" the defendant, "as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE § 8.01(a).
As insanity is an affirmative defense, a defendant generally bears the burden to prove by a preponderance of the evidence that (1) because of severe mental disease or defect, (2) he did not know right from wrong at the time of the offense.
*303 TEX. PENAL CODE § 8.01 ; Riley v. State , 830 S.W.2d 584, 585 (Tex. Crim. App. 1992).
If the evidence shows that a court previously adjudged the defendant insane, however, the burden of proof shifts to the State.[1] On proof of an earlier judgment, like the one Hines supplied in this case, the defendant is presumed insane and the State must disprove insanity. See Arnold v. State , 873 S.W.2d 27, 30 (Tex. Crim. App. 1993) ; Manning v. State , 730 S.W.2d 744, 746 (Tex. Crim. App. 1987). The State may defeat the presumption of insanity by showing that, at the time of the charged conduct, the defendant knew his conduct was illegal. See Pham v. State , 463 S.W.3d 660, 671 (Tex. App.-Amarillo 2015, pet. ref'd) (citing Ruffin v. State , 270 S.W.3d 586, 592 (Tex. Crim. App. 2008) ). In making this determination, the factfinder may consider the appellant's demeanor before and after the offense, including any attempt to evade the police. Dashield , 110 S.W.3d at 115 (citing Schuessler v. State , 719 S.W.2d 320, 329 (Tex. Crim. App. 1986), overruled on other grounds , Meraz v. State , 785 S.W.2d 146, 155 (Tex. Crim. App. 1990) ; and Murray v. State , 147 Tex.Crim. 474, 182 S.W.2d 475, 477 (1945) ).
The trial court heard conflicting expert testimony as to whether Hines knew that killing Chime was illegal at the time he committed the offense. Hines contends that the testimony of Dr. Glass, the defense expert, provided a more accurate picture of Hines's mental condition at the time of the offense because, unlike the State's experts, he: (1) emphasized the importance of Hines's history of mental illness and psychotic episodes; (2) considered Hines's possible noncompliance with his prescribed medication regimen at or near the time of the offense; (3) accounted for the stressful events in Hines's life that occurred within the two days before the offense, which could have triggered heightened anxiety in Hines; and (4) considered Hines's own behavior during that period, which manifested symptoms of increasing mania.
Whether the defendant is legally insane, however, is not the same issue as whether the defendant has been diagnosed with a mental illness causing psychosis. See Clark v. Arizona , 548 U.S. 735, 774-76, 126 S.Ct. 2709, 2734-35, 165 L.Ed.2d 842 (2006). In Clark , the majority explained that a diagnosis of serious mental illness does not necessarily answer the question of whether the defendant had the "cognitive, moral, volitional, or other capacity" for "conventional guilt and criminal responsibility," and it cautioned that mental-disease evidence has the potential to mislead jurors into believing that the mental-disease classification "may suggest something very significant about a defendant's capacity, when in fact the classification tells us little or nothing" about the defendant's ability to form mens rea or exercise "the cognitive, moral, or volitional capacities *304 that define legal sanity." Id. at 773-74, 126 S.Ct. at 2734. The trial court thus had the discretion to accept, reject, or give more or less weight to Dr. Glass's testimony in finding that Hines was not legally insane when he killed Chime. See id. ; Williams , 235 S.W.3d at 750 ; Dashield , 110 S.W.3d at 115.
Hines's actions before and after the crime show premeditation and an understanding that killing Chime was an illegal act; such evidence supports the trial court's determination that the State adduced sufficient evidence to overcome any presumption of insanity. Before meeting with Chime, Hines fitted his gun with a potato to muffle the sound when he fired it to minimize the risk of alerting others to the shooting. He concealed the gun behind his back as he approached Chime. While talking with Chime, Hines focused on any movements Chime made, and shot Chime as soon as he saw Chime move.
Immediately after the shooting, Hines took measures to conceal the crime. He pushed Chime's body into the passenger seat and drove the truck to a house he knew would be unoccupied. His thoughts were focused on finding a place he could leave the truck and the body without being detected. After dark, he returned to his condo to finalize his plan. He drove the truck to a location several miles away, close to where Chime's family lived, and abandoned it there. He did not tell the police or anyone else about killing Chime or the whereabouts of Chime's body.
These actions support the trial court's implicit finding that Hines knew his conduct was illegal. Further, the trial court had the opportunity to observe Hines's demeanor shortly after the crime by watching the videotaped interrogations. The experts agreed that Hines had mental illness. Hines, however, told Dr. Stolar that his mental illness was never so severe that he did not understand that murdering is a crime. Considering the evidence in the light most favorable to the trial court's finding, we hold that a rational factfinder could have found beyond a reasonable doubt that Hines knew right from wrong at the time of the murder.
III. Self-Defense
Hines further contends that the evidence is legally insufficient to support the trial court's rejection of his self-defense claim. "The Penal Code justification for self-defense focuses on the existence of some necessity, the circumstances under which the force was used, the degree of force used, and the type of conduct against which the force was used." Kelley v. State , 968 S.W.2d 395, 399 (Tex. App.-Tyler 1998, no pet.). A person is justified in using force against another when and to the degree that he reasonably believes the force is immediately necessary to protect against the other person's use or attempted use of unlawful force. TEX. PENAL CODE § 9.31(a). If a person is justified in using force under section 9.31, he may use deadly force when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force. Id. § 9.32(a). A "[r]easonable belief" is that which "would be held by an ordinary and prudent man in the same circumstances as the actor." Id. § 1.07(a)(42). "Deadly force" is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Id. § 9.01(3). The amount of force used must be in proportion to the force encountered. Kelley , 968 S.W.2d at 399.
The defendant bears the burden of producing some evidence to support his self-defense claim. Zuliani v. State , 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).
*305 Once the defendant produces that evidence, the State then bears the burden of persuasion to disprove the defense. Id. This burden of persuasion does not require the State to produce evidence to disprove the defense; it must only prove its case beyond a reasonable doubt. Id. ; Hernandez v. State , 309 S.W.3d 661, 665 (Tex. App.-Houston [14th Dist.] 2010, pet. ref'd) ; see also McClesky v. State , 224 S.W.3d 405, 409 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd) (explaining that the State is required to prove elements of offense beyond a reasonable doubt and to persuade factfinder beyond a reasonable doubt that defendant did not kill in self-defense).
Hines points to evidence that his fear of Chime stemmed from his knowledge that Chime had a prior history of violence and had used intimidation tactics to resolve debts. He argues that the events in Hines's own life before committing the offense influenced his perception that Chime posed a threat of serious bodily injury or death. Hines's subjective mental state, however, does not justify his use of deadly force; the law permits self-defense only when the actor reasonably believes that deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force. See TEX. PENAL CODE § 9.32(a).
Hines's general fear of Chime is insufficient to support a claim of self-defense. Hines admitted that Chime never specifically threatened to kill him, and the trial court was free to reject evidence that Hines believed Chime had a gun. Hines claimed that Chime talked to him about a gun in general terms, but no evidence shows that Chime displayed a gun before Hines pulled the trigger, and no gun was found in Chime's truck. Based on all of the evidence, viewed in the light most favorable to the verdict, we hold that a rational factfinder could have found against Hines on the self-defense issue beyond a reasonable doubt. See Saxton v. State , 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) ; Denman v. State , 193 S.W.3d 129, 132-33 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd).
IV. Court Costs
Finally, Hines complains that the "Summoning Witness/Mileage Fee" ordered to be collected from him as a court cost pursuant to Texas Code of Criminal Procedure article 102.011(a)(3) and (b) violates the Separation of Powers Clause of the Texas Constitution. See TEX. CONST . art. II, § 1. Our Court rejected this constitutional challenge in Allen v. State , No. 01-16-00768-CR, 570 S.W.3d 795, 2018 WL 4138965 (Tex.App.-Hous. [1st Dist.] Aug. 30, 2018, no pet. h.) (op. on reh'g). Following Allen , we reject Hines's constitutional challenge to the assessment of court costs for the summoning witness/mileage fee.
CONCLUSION
We affirm the judgment of the trial court.

The State questions whether this presumption of insanity, which has its origins in the common law, remains good law in Texas. The State observes that before the legislature revised the Penal Code in 1974, the Code provided that "[t]he rules of evidence known to the common law as to the proof of insanity shall be observed in all trials where that question is an issue." See Nilsson v. State , 477 S.W.2d 592, 599 (Tex. Crim. App. 1972) (quoting Tex. Penal Code art. 35 (1925) ). The current Penal Code contains no such provision and makes no exception allowing burden-shifting for this defense based on proof of a prior adjudication of insanity. See Tex. Penal Code §§ 2.04, 8.01. As an intermediate appellate court, however, we are bound to follow the Court of Criminal Appeals' precedent. Ervin v. State , 331 S.W.3d 49, 53 (Tex. App.-Houston [1st Dist.] 2010, pet. ref'd). In any event, the State contends, and we agree, that applying the presumption does not affect the disposition of this appeal.