

# NUMBER 13-20-00507-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**MATTHEW WAYNE PILLOW,**                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

### On appeal from the 24th District Court
### of Jackson County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Silva**
**Memorandum Opinion by Justice Hinojosa**

Appellant Matthew Wayne Pillow appeals his conviction following a bench trial for aggravated assault of a public servant, with a deadly weapon finding, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(b)(2)(B). The trial court found Pillow guilty and sentenced him to sixty years' imprisonment. In one issue, Pillow argues that the evidence

is factually insufficient to support the trial court's rejection of his insanity defense. *See id.* § 8.01. We affirm.

## I. BACKGROUND

A grand jury returned an indictment charging Pillow with attempted capital murder, aggravated assault on a public servant, and aggravated assault with a deadly weapon. Pillow pleaded not guilty by reason of insanity. Pillow waived the right to trial by jury, and the case proceeded to a bench trial. Prior to trial, the State abandoned the charge of attempted capital murder.

### A. Incident

According to trial testimony, Pillow entered a convenience store in Edna, Texas, at around 4:00 p.m. Store employees observed Pillow place several bottled beverages inside his backpack without paying for them. As Pillow exited the store, a store employee informed him that they had called the police to report him for shoplifting.

Edna Police Officer Luis Chavez responded to the call. While driving his patrol car near the convenience store, Officer Chavez spotted a pedestrian matching Pillow's description—a male wearing a green camouflage jacket and khaki shorts—walking on the sidewalk. Officer Chavez pulled his vehicle over to the side of the road and activated his overhead lights. Pillow, who was ten to fifteen feet away, started walking in Officer Chavez's direction. Officer Chavez exited his patrol car and asked Pillow to come speak to him. Pillow responded by shaking his head "no" and reaching into his pocket. Officer Chavez instructed him to keep his hands out of his pocket, but Pillow retrieved a knife and started running toward Officer Chavez. The officer took a couple of steps backward,

unholstered his gun, pointed it at Pillow, and instructed Pillow to drop the knife. At that point, Pillow turned away and started walking away down the sidewalk. Officer Chavez, who had lost sight of Pillow, stayed with his patrol car and called for backup.

Meanwhile, civilian occupants of a nearby vehicle observed Pillow sneaking around the rear of Officer Chavez's vehicle in a crouched position. Moments later, Officer Chavez saw Pillow running toward him at full speed while brandishing a knife. Officer Chavez pointed his gun at Pillow and commanded him to drop the knife, but Pillow kept charging. He twice told Pillow to stop, and when Pillow did not comply, he discharged his weapon two times. At that point, Pillow kept advancing, so Officer Chavez shot Pillow two more times. Pillow was struck by multiple bullets, including in his hand, causing him to drop the knife. Pillow turned around and started running away from Officer Chavez until he collapsed in a nearby grassy area. Shortly thereafter, emergency medical personnel transported Pillow by ambulance to a local hospital.

## B. Expert Testimony

Pillow was evaluated by two psychologists and one psychiatrist as to whether he was legally insane at the time of the offense. Pillow told each of the evaluators that he suffered from a delusion at the time of the offense that he was the false prophet from the Bible and God would not allow him to be shot. He also made statements about seeing military trucks and zombies. Nevertheless, Pillow acknowledged that he knew Officer Chavez was stopping him for shoplifting and he charged Officer Chavez with a knife because he did not want to be arrested.

3

## 1.    Medical Records

Each evaluator had access to Pillow's prior hospitalization and mental health treatment records, which can be summarized as follows.

In June 2014, Pillow was admitted to Northwest Regional Hospital in Corpus Christi, Texas, before being transferred to San Antonio State Hospital (SASH) for treatment of mental health issues. Pillow reported he had been "ambushed" by "guys in camouflage in the backyard." During treatment, Pillow admitted to recent use of alcohol, marijuana, and methamphetamines. Pillow's father reported that Pillow had used methamphetamine the day he was taken to the hospital.

In March 2015, police transported Pillow to Citizen's Medical Center for being suicidal. Pillow claimed he was a CIA agent and refused to comply with the commands of law enforcement when approached. While hospitalized, Pillow threatened the police, while also stating that he "wanted the police to kill him as well." He was then referred to Gulf Bend Center (GBC). GBC records indicate that Pillow has a history of schizophrenia.

Pillow subsequently received inpatient psychiatric treatment at Gulf Coast Medical Center as a result of his threatening behavior at GBC. Medical staff diagnosed Pillow with polysubstance abuse, drug-induced psychosis, and "personality disorder, NOS." He was then transferred to SASH for a second time. Pillow was discharged in May 2015 with a diagnosis of paranoid schizophrenia and stimulant abuse.

Pillow was seen by GBC for aftercare in May 2015 and received a diagnosis of schizophrenia and inhalant abuse. GBC staff saw Pillow on October 18, 2015, after he allegedly tied a shirt around his neck while in the Jackson County Detention Center. Pillow

4

denied that this behavior represented a suicide attempt or that he had any history of suicidal thoughts.

Pillow was admitted to the Brazosport Regional Health System on May 2, 2016, one month prior to the underlying offense. Pillow's family called for an ambulance because he was unable to stand and was acting weird. Pillow admitted to smoking synthetic marijuana the morning of his admission. Medical staff observed Pillow displaying symptoms associated with synthetic marijuana or methamphetamine use.

After the charged offense, Pillow was sent to North Texas State Hospital for competency restoration treatment. During initial treatment, providers had "concerns of deceit" regarding Pillow, and they questioned whether he had a genuine mental illness. Pillow stated that his past hospitalizations were due to being on drugs. Pillow admitted to recent alcohol, marijuana, and methamphetamine use.

### 2. Letters from Jail

The evaluators also reviewed two letters written by Pillow to his brother while he awaited trial. In the letters, Pillow shared his delusion that he was the false prophet from the Bible. Pillow stated that he was killed multiple times and God brought him back to life. Pillow also referred to heroin and ecstasy and doing a "bump" of purple powder in each nostril. In describing the shoplifting incident, Pillow stated he put several bottled beverages in his backpack and that store personnel told him they were calling the police as he left the store. Pillow described seeing a police officer in an SUV with his siren activated. Pillow explained that he had an outstanding warrant. Pillow planned to throw a stone at the officer and then run up and stab the officer in the neck with his knife. Pillow

claimed he became scared and ran toward the back of the officer's car. Pillow then described rushing the officer and being shot six times. He stated that he then turned around and ran fifty yards before laying down in some tall grass. Pillow wrote that he planned to get out of jail by pleading not guilty by reason of insanity.

### 3. Troy Martinez, PhD

Dr. Martinez is a clinical psychologist. In addition to evaluating Pillow in person, Dr. Martinez reviewed police reports and mental health treatment records. Dr. Martinez issued a report concluding that Pillow was more likely than not sane at the time of the alleged offense. Dr. Martinez diagnosed Pillow with schizophrenia and polysubstance abuse. He noted that "[a]vailable data provides compelling, reliable evidence that [Pillow] does have a severe mental illness/disease[.]" However, Dr. Martinez was not convinced that Pillow "was unable to know, recognize, or appreciate the wrongfulness of his actions at the time [of the alleged offense]." Dr. Martinez found Pillow's behavior in shaking his head "no" and pulling out a knife to be goal-directed, indicating that he understood the wrongfulness of his actions. He did not find that Pillow was being honest about his lack of recent drug use at the time of the assault based on hospitalization records that indicated Pillow had used synthetic marijuana, cocaine, and marijuana as recently as a month prior. Dr. Martinez also noted a prior hospitalization in which Pillow had tested positive for methamphetamine and marijuana.

Dr. Martinez reviewed Pillow's letters to his brother. According to Dr. Martinez, Pillow provided "a lot of detail" about the incident in the letters. He believed Pillow's account was "sequential," "logical," and "rational." He also noted that the letters contained

"classic delusional rambling."

### 4. Joel Kutnick, M.D.

Dr. Kutnic, a psychiatrist, interviewed Pillow remotely using videoconferencing. He also reviewed Pillow's mental health and police records. He initially authored a report concluding that "because of his Schizophrenia causing psychotic symptoms, [Pillow] had a mental disease or defect which caused him [to be] unable to realize his conduct was wrong." After receiving additional information, Dr. Kutnick issued several addendums to his report. Ultimately, Dr. Kutnick concluded that he cannot "definitively state [Pillow] meets criteria for insanity[.]" Dr. Kutnick noted that Pillow had told people that "he was robbing a store for drinks and didn't feel like being arrested" which "led him to charge the police officer with the knife." He believed that Pillow understood "by making this statement, he was admitting he did not meet criteria for the insanity defense." However, Dr. Kutnick also noted other statements that suggest Pillow was psychotic at the time of the incident such as wondering if the officer was a CIA agent and delusions about zombies and military trucks.

Dr. Kutnic ruled out malingering with respect to his presentation of mental illness based on Pillow's behavior while hospitalized. Dr. Kutnic believed Pillow had the ability to lie and manipulate. Dr. Kutnic could not rule out drugs as causing Pillow's psychotic symptoms. For instance, Pillow admitted to using synthetic marijuana a month prior to the incident, and a typical hospital drug test does not screen for the drug.

### 5.    Shawn Roberson, PhD

Dr. Roberson, a psychologist, conducted an in-person evaluation of Pillow. He also reviewed Pillow's medical and police records. Dr. Roberson conducted five objective psychological tests to determine Pillow's mental status and whether he was malingering. The results of the test indicated that Pillow was not malingering memory impairment or mental illness. Dr. Roberson stated that when Pillow was stopped by Officer Chavez, he "knew factually what was going to occur and the reason he was being stopped and what the consequences of that could be." Dr. Roberson stated that Pillow nevertheless "felt like he had a need to throw in some psychotic explanation for why he was doing what he was doing[.]" According to Dr. Roberson, Pillow referenced "past delusions that he believed he had a special religious significance." Pillow believed that "God would not allow him to be shot or even arrested by the officer." Pillow also stated that he "didn't agree with being arrested or even messed with." Dr. Roberson believed that Pillow's statements suggest "that he clearly understood at the time of contact with the officer that he might be arrested for shoplifting and taken to jail."

Dr. Roberson noted that in each of Pillow's prior hospitalizations, he exhibited drug use. He explained that Pillow "used drugs that can cause psychotic symptoms" and that Pillow "presented as psychotic at times when he was on drugs." Dr. Roberson opined that drug use "could have caused his symptoms for each and every one of [Pillow's] hospitalizations." Dr. Roberson could not rule out the possibility that Pillow has a severe mental illness, but he could also not rule out that Pillow's symptoms have been primarily substance induced. Dr. Roberson concluded in his report that "it appears more probable

8

that [sic] not that [Pillow's] behavior represented an attempt to avoid arrest rather than an act driven by religious or paranoid delusion." In other words, Pillow "likely knew that his behavior was wrong at the time of the index offenses."

## C. Verdict & Sentence

The trial court found that Pillow did not prove that he was legally insane at the time of the offense by a preponderance of the evidence. The trial court found Pillow guilty of aggravated assault of a peace officer. It also made a deadly weapon finding. The trial court sentenced Pillow to sixty years' imprisonment. This appeal followed.

## II. DISCUSSION

## A. Standard of Review & Applicable Law

A defendant is presumed sane and that "he intends the natural consequences of his acts." *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a). "Under Texas law, 'wrong,' in this context, means 'illegal.'" *Ruffin*, 270 S.W.3d at 592. Even if a defendant believes his actions were morally justified, so long as the defendant knows the actions were illegal, the affirmative defense of insanity is not available. *Id.*

> The issue is not strictly medical, and expert witnesses, although capable of giving testimony that may aid the [factfinder] in its determination of the ultimate issue, are not capable of dictating determination of that issue. Only the [factfinder] can join the non-medical components that must also be considered in deciding the ultimate issue. That ultimate issue of criminal responsibility is beyond the province of expert witnesses. Were it otherwise, the issue would be tried in hospitals rather than the courts.

9

*Petetan v. State*, 622 S.W.3d 321, 360 (Tex. Crim. App. 2021) (quoting *Graham v. State*, 566 S.W.2d 941, 949 (Tex. Crim. App. 1978)). "The circumstances of the crime itself are also important in determining the mental state of the accused at the time of the commission of the offense[.]" *McAfee v. State*, 467 S.W.3d 622, 637 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (citing *Graham*, 566 S.W.2d at 951). The factfinder may consider "evidence indicating knowledge of wrongful conduct, such as an attempt to conceal incriminating evidence or elude law enforcement." *Id.* Insanity caused by voluntary intoxication does not constitute a defense to the commission of a crime. TEX. PENAL CODE ANN. § 8.04(a). "[I]f a pre-existing mental condition does not 'in and of itself' render the accused 'legally insane,' 'then the recent use of intoxicants causing stimulation or aggravation of the pre-existing condition to the point of insanity cannot be relied upon as a defense to the commission of the crime itself.'" *Dana v. State*, 420 S.W.3d 158, 166 (Tex. App.—Beaumont 2012, pet. ref'd) (quoting *Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex. Crim. App. 1972)). The defendant must prove insanity by a preponderance of the evidence. TEX. PENAL CODE ANN. § 2.04(d).

Pillow challenges only the factual sufficiency of the evidence to support the trial court's rejection of his affirmative defense. Pillow claims that the adverse finding on his affirmative defense was so against the great weight and preponderance of the entire body of admitted evidence as to be manifestly unjust. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2015). In review of the factual sufficiency to support the factfinder's rejection of an affirmative defense, we consider all of the evidence in a neutral light while preserving the factfinder's weight and credibility determinations. *Id.* We may find the

10

evidence factually insufficient "only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] clearly state[ ]why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id*. If we reverse the trial court based upon a factual-insufficiency claim, the remedy is a new trial rather than an acquittal. *Id.* at 672.

**B.     Analysis**

Viewing the record in a neutral light, we note that there was evidence that Pillow suffered from schizophrenia causing him to have delusions. For instance, Pillow told various people that, at the time of the offense, he believed he was the false prophet from the Bible and God would not allow him to be shot. Pillow also had delusions involving military trucks and zombies. In addition, Pillow had a long history of hospitalizations for his mental health issues. However, even if we were to assume that this constitutes some evidence supporting insanity, we must weigh this contrary evidence against evidence supporting the verdict. *Matlock*, 392 S.W.3d at 671.

As to evidence supporting the trial court's rejection of the defense, we note that none of the three experts ultimately concluded that Pillow met the criteria for the insanity defense. While the factfinder is not bound by the conclusion of the experts, it may accept or reject, in whole or in part, the opinion testimony of mental health professionals. *See Dashield v. State*, 110 S.W.3d 111, 115 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). There was also evidence that Pillow's actions could have been caused by recent drug use. Based on Pillow's long history of drug abuse, Dr. Roberson opined that Pillow's

11

delusional behavior could have been caused by voluntary intoxication—a drug induced psychosis—and not a mental disease or defect. *See* TEX. PENAL CODE ANN. § 8.04(a); *Dominguez v. State*, 661 S.W.2d 759, 761–62 (Tex. App.—El Paso 1983, pet. ref'd) (noting that the evidence depicted "a state of psychosis rising to the level of legal insanity" but that there was an issue of whether defendant's mental condition "was triggered by substance abuse amounting to voluntary intoxication" and concluding that the evidence was sufficient to support a jury's conclusion that continued use of certain medication constituted voluntary intoxication). There was evidence that Pillow was not always truthful regarding his drug use and that synthetic marijuana, which Pillow had used recently, does not show up on hospital drug screens. Further, Pillow's hospitalization records showed that his psychotic episodes were typically preceded by the use of drugs such as cocaine, methamphetamine, and synthetic marijuana.

There was also evidence which could have permitted the trial court to conclude that, although Pillow suffered from a mental disease or defect, he otherwise appreciated that his actions were wrong. *See Ruffin*, 270 S.W.3d at 592; *see also Hines v. State*, 570 S.W.3d 297, 303 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Whether the defendant is legally insane, however, is not the same issue as whether the defendant has been diagnosed with a mental illness causing psychosis."). Pillow at times provided a cogent retelling of the events leading to his arrest. Pillow's motivation for his actions was unrelated to any delusions he was possibly having. He stated that he wanted to avoid being arrested for shoplifting. According to each expert, this statement indicates that Pillow knew his actions were illegal, even if he thought they were otherwise moral due to

12

some psychotic delusion. *See Pham v. State*, 463 S.W.3d 660, 666 (Tex. App.—Amarillo 2015, pet. ref'd) (concluding that the evidence was factually sufficient to support jury's implied rejection of the defendant's affirmative defense of insanity in a murder prosecution where the evidence suggested that, at the time of the murder, the defendant was able to distinguish right from wrong); *see also Redding v. State*, No. 2-09-095-CR, 2010 WL 2132734, at *6 (Tex. App.—Fort Worth May 27, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that the evidence was factually sufficient to show that the defendant knew his actions were wrong where "[h]e went to City Hall with a gun in order to fire that gun inside, in the hope that he would be caught, brought to trial, and get a chance to air his grievances in open court").

The trial court reasonably could have resolved the conflicting evidence regarding insanity by concluding that Pillow had not met his burden of proving the defense by a preponderance of the evidence. *See Matlock*, 392 S.W.3d at 671. After reviewing all the evidence in a neutral light, while deferring to the trial court's weight and credibility determinations, we are unable to conclude that the trial court's rejection of Pillow's insanity defense "is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See id.*; *see also Moranza v. State*, 913 S.W.2d 718, 725–26 (Tex. App.—Waco 1995, pet. ref'd) (concluding that the jury's rejection of insanity defense was not manifestly unjust despite defendant's diagnosis of paranoid schizophrenia and despite expert testimony that defendant was legally insane given other evidence that was presented at trial). We overrule Pillow's sole issue.

13

### III.     CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
8th day of September, 2022.