Opinion issued July 18, 2019



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-18-00018-CR

### NO. 01-18-00019-CR

### NO. 01-18-00020-CR

_____

**GUSTAVO AYBAR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1493128, 1500417 & 1500418**

---

## MEMORANDUM OPINION

Following a joint trial on three separate indictments, a jury found Gustavo

Aybar guilty of the offenses of child endangerment, manslaughter, and aggravated

assault.[1] After finding enhancement allegations regarding prior felony convictions to be true in each case, the jury assessed the following punishment for Aybar: 2 years in prison for the child-endangerment offense, 27 years in prison for the manslaughter offense, and 12 years in prison for the aggravated-assault offense.[2]

Aybar appeals each judgment of conviction. In the child-endangerment case, he challenges the sufficiency of the evidence to support his conviction, and he asserts charge error. In the manslaughter and aggravated-assault cases, he contends that he received ineffective assistance of counsel. In all three appeals, Aybar challenges the assessment of various costs and fees.

We affirm the judgment of conviction in the manslaughter case, and we affirm as modified the judgments of conviction in the child-endangerment and aggravated-assault cases.

**Background**

Around 6:00 p.m. on December 26, 2015, Charles Futrell and his wife, Yolanda, were traveling west on Interstate 10 (I-10) through Houston to attend a family Christmas celebration in Katy. Charles was driving their Nissan Versa, and

---

[1]  *See* TEX. PENAL CODE § 22.041(c) (child endangerment); *id.* § 19.04 (manslaughter); *id.* § 22.02 (aggravated assault).

[2]  Appellate cause number 01-18-00018-CR corresponds to trial court cause number 1493128 (child endangerment). Appellate cause number 01-19-00018-CR corresponds to trial court cause number 1500417 (manslaughter). Appellate cause number 01-18-00020-CR corresponds to trial court cause number 1500418 (aggravated assault).

Yolanda was in the passenger's seat. They were in the high-occupancy vehicle lane (HOV) lane, traveling around 60 miles per hour with the flow of traffic.

To get to their destination, the Futrells needed to take the Barker Cypress exit from I-10. Charles moved from the HOV lane and began to make his way into the stream of traffic on the freeway to reach the Barker Cypress exit.

At that time, Aybar was also on I-10. He was not far behind the Futrells. He was driving a white Cadillac with his three-year-old son, G.A., in the backseat. Unlike the Futrells, Aybar was not driving with the flow of traffic. Aybar was driving his Cadillac around 100 miles per hour, weaving in and out of traffic, cutting off cars, and driving on the shoulder. Other motorists had called 9-1-1 to report Aybar's highspeed, erratic driving.

M. Henry was also on I-10 behind the Futrells. Henry later testified that he was driving 60 miles per hour. He said that traffic was moderate and flowing continuously.

As he drove, Henry looked in his rearview mirror. He saw Aybar's Cadillac and a Toyota Camry coming up fast behind him, weaving through traffic. He estimated that the two cars were traveling at 90 to 100 miles per hour. Henry thought that the two cars were racing because they were moving from lane to lane trying to pass other cars. The Camry made it through traffic and passed Henry, but Aybar's Cadillac did not. In his rearview mirror, Henry saw Aybar coming up fast

3

directly behind him. To avoid hitting Henry, Aybar swerved to the left. Henry then saw Aybar's Cadillac clip the back-passenger side of the Futrell's Nissan Versa. The Futrell's vehicle flipped, flew over the hood of Henry's car, and rolled across the roadway, landing on its roof on the other side of the freeway. Aybar's Cadillac hit the concrete barrier bordering the HOV lane, bounced off the barrier, and hit the back of Henry's car.

Motorists stopped at the scene to help. They flipped the Futrell's Nissan over right-side up. Yolanda Futrell was already dead, having died from the injuries she sustained in the accident. An autopsy showed that the cause of Yolanda's death was blunt trauma to her head, torso and extremities, with multiple fractures and brain injuries.

Charles Futrell survived the crash but was injured. An artery in Charles's arm was severed during the accident, and he suffered a broken neck and shoulder. Charles was airlifted from the accident scene by helicopter to a level-one trauma hospital. At trial, Charles indicated that he had healed from his physical injuries but still had difficulty with his equilibrium.

Henry bumped his head in the accident but did not receive medical treatment. Aybar's son, G.A., who was in the backseat of the Cadillac, had a facial abrasion after the accident.

4

Aybar was indicted for the offenses of child endangerment, manslaughter, and aggravated assault. With respect to child endangerment, the indictment alleged that Aybar had "intentionally and knowingly engage[d] in conduct that placed [G.A.], a child younger than fifteen years of age . . . in imminent danger of bodily injury, namely, by weaving in and out of traffic at a high rate of speed." The manslaughter indictment alleged that Aybar had "recklessly cause[d] the death of Yolanda Futrell by failing to control speed, failing to maintain a single lane, failing to keep a proper lookout, and by driving his motor vehicle and causing it to collide with a motor vehicle occupied by Yolanda Futrell." The aggravated assault indictment alleged that Aybar had "recklessly cause[d] serious bodily injury to Charles Futrell . . . by failing to control speed, failing to maintain a single lane, failing to keep a proper lookout, and by driving his motor vehicle and causing it to collide with a motor vehicle occupied by [Charles Futrell]."

Among the State's witnesses were Charles Futrell, eyewitnesses to the crash, first responders, law enforcement officers who had investigated the crash, and the assistant medical examiner. The State's evidence also included 9-1-1 calls, describing Aybar's driving before the accident and indicating that Aybar had caused the crash. In addition, crash data recorded by Aybar's Cadillac showed that, four seconds before the crash, Aybar was going 103 miles per hour.

5

Aybar testified in his own defense during the guilt-innocence phase. He stated that, at the time of the accident, he was taking his three-year-old son, G.A., to a birthday party. He said that his friend, Latrell, was in the front-passenger seat of the car and that he and Latrell had smoked a half a cigar of marijuana about 30 minutes before the crash. Aybar claimed that marijuana makes him "focused" and that he felt focused while driving before the accident.

Aybar testified that he routinely drives fast while weaving in and out of traffic. And he said that he has driven other cars at over 100 miles per hour, but he had never driven the Cadillac that fast. Aybar did not deny that he was going over 100 miles per hour before the accident, but he said that he was not looking at his speedometer that night.

Aybar explained why he was driving so fast and erratically at the time of the accident. He denied that he was racing with the Camry before the accident. Aybar said that he did not know the directions to the birthday party, so he was following his friend, K. Melton, who was driving the Camry. He said that Melton was driving fast and weaving in and out of traffic. Aybar claimed that he was trying to keep up with her and to not lose sight of the Camry, causing him to drive fast and mimic Melton's erratic driving. Aybar said that Melton entered the HOV lane, which surprised him, and he was trying to keep pace with her. He claimed that the accident occurred when Melton suddenly exited the HOV lane and cut across all

6

lanes of traffic. Aybar said that Melton's action caused the cars in front of him to brake. He then pushed hard on his brakes and steered the Cadillac to the left to avoid hitting the car in front of him and cars to his right. He testified that he lost control of his car and hit the concrete barrier to his left.

Aybar denied hitting any other car. Specifically, he denied hitting the Futrells' vehicle and Henry's car. But he agreed that he had caused the accident. When asked how, Aybar testified, "Me wrecking, me wrecking, me hitting the [concrete barrier] wall and causing a big commotion, that's what caused the wreck. I admit that."

On direct examination, Aybar indicated that he was not aware of the risks that his driving posed to other drivers that night and he did not "think that this was going to happen." On cross-examination, however, Aybar acknowledged that he was aware that driving in the manner he was that night could result in a crash and that his son and other people could be injured.

The jury found Aybar guilty of the offenses of child endangerment, manslaughter, and aggravated assault. After finding enhancement allegations to be true, the jury assessed Aybar's sentence at 2 years in prison for child endangerment, 27 years in prison for manslaughter, and 12 years in prison for aggravated assault.

Aybar appeals each of the three judgments of conviction.

7

## Sufficiency of the Evidence

In his first issue in the child-endangerment case, Aybar claims that the evidence was not sufficient to support his judgment of conviction.

### A.      Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

Pursuant to the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *In re Winship*, 397 U.S. 358, 361 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively

8

establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326.

In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B.    Elements of Child Endangerment**

A person commits the offense of child endangerment if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death,

9

bodily injury, or physical or mental impairment. TEX. PENAL CODE § 22.041(c). Here, as modified by the indictment, the State was required to prove beyond a reasonable doubt that Aybar "intentionally and knowingly engage[d] in conduct that placed [his son] a child younger than fifteen years of age . . . in imminent danger of bodily injury, namely, by weaving in and out of traffic at a high rate of speed[.]" *See* TEX. PENAL CODE § 22.041(c). The indictment did not allege that Aybar had committed child endangerment recklessly or with criminal negligence.

**C.    Analysis**

Aybar asserts that the evidence is legally insufficient to support his conviction because the offense of endangering a child is a result-of-conduct offense, and the State failed to prove beyond a reasonable doubt that Ayba intentionally or knowingly endangered his son.

Courts "distinguish offenses into three different categories of offenses based on the offense-defining statute's gravamen, or focus: 'result of conduct,' 'nature of conduct,' or 'circumstances of conduct' offenses." *Robinson v. State*, 466 S.W.3d 166, 170 (Tex. Crim. App. 2015). Result-of-conduct offenses concern the product of certain conduct. *Robinson*, 466 S.W.3d at 170. Nature-of-conduct offenses are defined by the act or conduct that is punished, regardless of any result that might occur. *Id.* Lastly, circumstances-of-conduct offenses prohibit otherwise innocent behavior that becomes criminal only under specific circumstances. *Id.*

10

Aybar asserts that child endangerment is a result-of-conduct offense. For a result-of-conduct offense, the culpable mental state relates not to the nature or circumstances surrounding the charged conduct, but to the result of that conduct. *See Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). For this reason, Aybar asserts that, as charged in the indictment, the State was required to prove that he intentionally or knowingly placed his three-year-old son in imminent danger of bodily injury. Even if we assume (without deciding) that child endangerment is a result-of-conduct offense, as Aybar asserts, the evidence presented at trial was sufficient to support Aybar's conviction.[3] Specifically, the evidence was sufficient to show that Aybar knowingly placed his three-year-old son in imminent danger of bodily injury.

A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE § 6.03(b). Intent, being a question of fact, is within the sole purview of the jury.

---

[3] The State disagrees with Aybar's characterization of child endangerment as a result-of-the conduct offense; it asserts that it is a nature-of-the conduct offense. We note that courts have disagreed regarding whether child endangerment is a "nature of conduct" or "result of conduct" offense. *Compare Walker v. State*, 95 S.W.3d 516, 520–21 (Tex. App.—Fort Worth 2002, pet. ref'd) (concluding that child endangerment is nature-of-the-conduct offense because Section 22.041(c) expresses clear legislative intent that a person commits child endangerment if he intentionally or knowingly "engages in conduct" that places child in imminent danger of death, bodily injury, or physical, or mental impairment), *with Millslagle v. State*, 81 S.W.3d 895, 897 n.1 (Tex. App.—Austin 2002, pet. ref'd) (concluding that, even though Section 22.041(c) contains phrase "engages in conduct," child endangerment appears to be "result of conduct" offense).

*Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). Criminal intent may be inferred from the defendant's conduct and the surrounding circumstances. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

In his brief, Aybar recognizes as follows:

It [is] undisputed that [Aybar] was driving at a high rate of speed and was weaving in and out of traffic before the crash. Multiple 911 calls were introduced into evidence that reported the [Aybar's] Cadillac was erratically driving at a least 100 miles per hour and caused the accident. Multiple witnesses also testified as to [Aybar's] speeding and weaving in and out of traffic and one witness also believed that the [Aybar] and the driver of the Camry were racing.

During cross-examination, Aybar acknowledged that he had been driving erratically at high speeds "off and on" over the course of many miles before the crash. Aybar also testified as follows:

[The State:] And you know that people in a car that's speeding along at a hundred miles per hour that they could get into a crash, right?

[Aybar:] Yes, sir.

Q. And they could suffer bodily injury as a result of it, right?

A. Yes, sir.

Q. And you were aware that you or Latrell or even [your son, G.A.] could have been injured in a crash?

A. Yes, sir.

Q. And you were aware that other people could have been injured in a crash as well?

A. Yes, sir.

Q. Based upon you weaving in and out of traffic, right?

A. Yes, sir.

Q. Based upon you traveling at a high rate of speed, right?

A. Yes, sir.

. . . .

Q. You didn't know that if you hit another car doing a hundred that that person might suffer bodily injury?

A. Oh, yes, sir, yes, sir.

Q. So you're aware of all of these things, right?

A. Yes, sir.

We are mindful that juries are free to "use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *Aguilar v. State*, 263 S.W.3d 430, 434 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Based on the evidence showing that Aybar was speeding and driving erratically and his acknowledgment that he was aware of the risks of driving in such a manner, including the risk of injury, the jury could have rationally inferred that Aybar knew that he was placing his three-year-old son in imminent danger of bodily injury.

In his brief, Aybar points to portions of his own testimony to support his claim that the evidence was not sufficient. He relies on testimony in which he

"described himself as a fast driver whose practice was to weave in and out of lanes while he was driving" and in which he claimed that he had driven other cars more than 100 miles per hour without incident. He also points to his testimony indicating that he was speeding and weaving in and out of traffic because he was following Melton to a birthday party, and Melton was driving fast and erratically. He indicated that he was mirroring her driving to keep up with her because he did not know the route to the party. Aybar also testified that he did not hear other cars honking at him, but he admitted that he had the music so loud in his car that he would not have heard the honking. Aybar points out that he testified that he did not know how fast he was driving that night because he did not look at the speedometer. He also indicated in his testimony that he felt "confident" and "focused" while driving that evening. And he points out that he testified that "he was not aware of the risks that his driving posed for other drivers that night as he did not think this would happen."

Aybar's arguments focus on the evidence favorable to him rather than viewing the evidence in the light most favorable to the verdict, as we are required to do. *See Jackson*, 443 U.S. at 319. And his arguments do not specifically address his state of mind as it relates to the awareness he had regarding endangering his son. His arguments also ignore the jury's ability to believe or disbelieve all or part of his testimony, resolve conflicts in the evidence, and draw reasonable inferences

14

from the evidence. *See Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Id.*; *see Jackson*, 443 U.S. at 326.

Given the evidence presented at trial and viewing it as we must, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Aybar knowingly placed his three-year-old son in imminent danger of bodily injury. *See* TEX. PENAL CODE § 22.04(c). We hold that the evidence is sufficient to support the judgment of conviction for the offense of child endangerment.

We overrule Aybar's first issue in the child-endangerment case.

## Jury Charge Error

In his second issue in the child-endangerment case, Aybar contends that the trial court erred by failing to properly tailor the definitions of the culpable mental states in the jury charge to the applicable conduct element of the offense and, because of this error, he suffered egregious harm. We disagree.

### A.    Standard of Review

We review alleged jury charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The

15

degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (setting forth procedure for appellate review of claim of jury charge error). If the jury charge error has not been properly preserved by an objection or request for instruction, as here, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Marshall*, 479 S.W.3d at 843; *accord Almanza*, 686 S.W.2d at 171.

## B. Analysis

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* TEX. CODE CRIM. PROC. art. 36.14; *Arteaga*, 521 S.W.3d at 334. Each statutory definition that affects the meaning of an element of the offense must be communicated to the jury. *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009). The jury charge should tell the jury what law applies and how it applies to the case. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *Taylor v.*

16

*State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Vega*, 394 S.W.3d at 518.

Penal Code Section 6.03 sets out four culpable mental states: intentionally, knowingly, recklessly, and criminally negligently. TEX. PENAL CODE § 6.03 Section 6.03 also delineates three "conduct elements" that can be involved in an offense: (1) the nature of the conduct, (2) the result of the conduct, and (3) the circumstances surrounding the conduct. *Id*; *see Robinson*, 466 S.W.3d at 170; *McQueen*, 781 S.W.2d at 603.

An offense may contain any one or more of these three conduct elements, which alone or in combination form the overall behavior that the legislature has intended to criminalize, and it is those essential conduct elements to which a culpable mental state must apply. *McQueen*, 781 S.W.2d at 603. The Court of Criminal Appeals has determined that, "[i]n a jury charge, the language in regard to the culpable mental state must be tailored to the conduct elements of the offense." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015).

When "specific acts are criminalized because of their very nature, a culpable mental state must apply to committing the act itself." *McQueen*, 781 S.W.2d at 603. "On the other hand, unspecified conduct that is criminalized because of its result requires culpability as to that result." *Id.* "A trial court errs when it fails to

17

limit the language in regard to the applicable culpable mental states to the appropriate conduct element." *Price*, 457 S.W.3d at 441 (citing *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994)).

Here, in the abstract portion of the jury charge, the trial court defined the indicted child-endangerment offense as follows: "[A] person commits an offense if he intentionally or knowingly, by act, engages in conduct that places a child younger than fifteen years in imminent danger of bodily injury." *See* TEX. PENAL CODE § 22.041(c). The trial court then provided the following definitions regarding the culpable mental states of "intentionally" and "knowingly":

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

These definitions track the language of Penal Code Section 6.03 and encompass all three "conduct elements." *See id.* § 6.03.

Aybar maintains that the offense of child endangerment involves only one conduct element: result of the conduct. On appeal, Aybar asserts that "the inclusion of nature-of-conduct instructions within the definition of intentionally and the inclusion of nature-of-conduct and circumstances-of-conduct instructions within

18

the definition of knowingly were error." In short, Aybar contends that, because child endangerment is result-of-conduct offense, the trial court erred by not limiting the culpable mental states of intentionally and knowingly to the result of his conduct.

Even if we assume that the trial court erred by not limiting the culpable mental states of intentionally and knowingly to the result of his conduct, we still must determine whether Aybar was harmed by that error. Aybar did not object at trial to the non-tailored definitions of the culpable mental states in the jury charge. Consequently, the jury charge error was not preserved, and reversal is required only if the error was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *See Marshall*, 479 S.W.3d at 843; *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171; *see also State v. Ambrose*, 487 S.W.3d 587, 595 (Tex. Crim. App. 2016) (reaffirming that under precedent of Court of Criminal Appeals, unpreserved jury charge error does not require new trial unless error causes "egregious harm").

Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Arteaga*, 521 S.W.3d at 338; *Marshall*, 479 S.W.3d at 843; *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the

19

trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). We will not reverse a conviction unless the defendant has suffered "actual rather than theoretical harm." *Id.*

Neither party has the burden to show harm or lack of harm; rather, we must examine the record and make an independent determination whether an appellant suffered actual harm as opposed to theoretical harm. *Marshall*, 479 S.W.3d at 843. In examining the record to determine whether jury charge error has resulted in egregious harm, we consider four factors: (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. *Arteaga*, 521 S.W.3d at 338; *Marshall*, 479 S.W.3d at 843; *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171.

*Entirety of the Jury Charge*

We begin the harm analysis by looking at the charge in its entirety. Although the charge did not limit the culpable mental states to the result of Aybar's conduct, the abstract portion of the charge did define the culpable mental states of intentionally and knowingly as they relate to the result of Aybar's conduct.

The charge's application paragraph contained the statutory elements of child endangerment as modified by the indictment, thereby instructing the jury on the law applicable to the case. *See* TEX. PENAL CODE § 22.041(c). The application

20

paragraph instructed the jury to find Aybar guilty of the offense of child endangerment if it found "from the evidence beyond a reasonable doubt that the defendant, Gustavo Aybar . . . intentionally or knowingly engage[d] in conduct that placed [G.A.], a child younger than fifteen years of age, in imminent danger of bodily injury, namely, by weaving in and out of traffic at a high rate of speed." However, neither the application paragraph nor any other part of the charge apprised the jury that the culpable mental states were limited to the result of Aybar's conduct. Thus, assuming Aybar is correct about the complained-of error, consideration of the entirety of the charge weighs in favor of finding egregious harm. *See, e.g.*, *Arrington*, 451 S.W.3d at 841 (concluding first factor weighed in favor of finding egregious harm because entirety of charge did not apprise jury of unanimity requirement).

*State of the Evidence*

The second factor requires us to review the state of the evidence, including the contested issues and weight of probative evidence. *Villarreal*, 453 S.W.3d at 433. Under this factor, "we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm." *Arrington*, 451 S.W.3d at 841.

Much of the evidence was uncontroverted, showing that Aybar drove at high rates of speed, topping 100 miles per hour, as he wove through traffic on a Houston

21

freeway. The evidence largely focused on the danger Aybar posed to other motorists that night, including the Futrells. The contested issue at trial primarily centered on whether Aybar had the culpable mental state of recklessness needed to convict him of manslaughter and aggravated assault. The State's position was that Aybar acted recklessly in causing Yolanda Futrell's death and Charles Futrell's bodily injury. Aybar asserted that he acted only negligently with respect to those offenses.

Some evidence, however, was offered relating specifically to the offense of child endangerment. Aybar admitted that he knew that his son was in the backseat, and he knew that "a car that's speeding along at a hundred miles per hour" could crash, and people in the car "could suffer bodily injury as a result." He also admitted that he knew that his son could have been injured in a crash. Although he indicated that he was not aware of the risks that his driving posed to *other drivers* that night, Aybar admitted that he was aware of the risk of injury to his son that his high-speed, erratic driving posed. The evidence specifically probative of the offense of child endangerment was not directed at Aybar's conduct, rather it focused on whether Aybar knew that his conduct endangered his son. In this regard, the evidence focused the jury on the result of Aybar's conduct with respect to child endangerment. Thus, the state of the evidence did not make it likely that the complained-of charge error caused Aybar actual harm.

*Arguments of Counsel*

We also consider whether any statements during the trial by the State, the defense, or the trial court may have exacerbated or ameliorated the error in the jury charge. *Arrington*, 451 S.W.3d at 844.

Although the closing arguments of the State and the defense focused primarily on the offenses of manslaughter and aggravated assault, each side made remarks pertinent to the offense of child endangerment. Defense counsel argued that, immediately before the accident, Aybar took evasive maneuvers to avoid hitting the cars to his right because Aybar knew that he had "his little boy sitting there," and "he is going at a high rate of speed." The defense's argument highlighted the risk of danger (the result) of which Aybar knew he had placed his son by his conduct.

Regarding the offense of child endangerment, the State made the following statement:

> [Child endangerment] doesn't have to actually result in bodily injury to that child, it just has to have conduct that places a child younger than 15 years in imminent danger of that bodily injury. So, that bodily injury, that hurt, that ouch doesn't have to happen. The fact that he put his own son in a situation where it was imminent that that could have occurred, that's sufficient under the law.

The State's argument does not mention the required culpable mental states of intentionally or knowingly. But the argument did focus on the result of conduct necessary to prove child endangerment. The State explained to the jury that, to find

23

Aybar guilty of child endangerment, the result of his conduct did not need to be actual bodily injury to his son; rather, the result of his conduct needed to be placing his son in imminent danger of bodily injury. At two other points in its argument, the State argued that, by his conduct, Aybar put his son in danger of bodily injury that night. The State's argument indicated that Aybar knew the danger to his son but "didn't care." In short, the State's argument highlighted the result of Aybar's conduct with respect to placing his son in danger of bodily injury. Thus, after considering the arguments of counsel, the third factor weighs against a finding of egregious harm.

*Any other relevant information*

Finally, our review of the record has disclosed no other relevant information that requires our consideration in the egregious-harm analysis.

*Conclusion Regarding Harm*

In his brief, Aybar writes that "[i]f this Court agrees with [his] contention that endangering a child is a result-of-conduct offense, this potentially would have caused the jury confusion as to which definition of intentionally or knowingly to apply." Perhaps Aybar is correct. However, potential or theoretical harm is not enough; the harm must be actual. *See Marshall*, 479 S.W.3d at 843.

Of the four factors, only the first—the charge itself—weighs in favor of a finding of egregious harm. *See Arrington*, 451 S.W.3d at 845. After reviewing the

record and considering the required factors, we conclude that any harm Aybar suffered from the trial court's failure to limit the culpable mental states of knowingly and intentionally to the result of Aybar's conduct in the abstract portion of the charge was theoretical, not actual. We hold that the charge error, if any, did not egregiously harm Aybar.

We overrule Aybar's second issue in the child-endangerment case.

## Ineffective Assistance of Counsel

In his first issue in both the manslaughter and aggravated-assault cases, Aybar contends that the he received ineffective assistance of counsel during the punishment phase of trial. Aybar asserts that his trial counsel should have objected to a portion of the State's closing argument, which Aybar contends amounted to a comment on his failure to testify during the punishment phase of trial.

## A.    Applicable Legal Principles

To prevail on a claim of ineffective assistance of counsel, an appellant must show the following: (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's errors, the result would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In reviewing counsel's performance, we

25

look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).

Aybar has the burden to establish both prongs by a preponderance of the evidence. *See Jackson v. State*, 973 S.W.2d 954, 956–57 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

## B.    Analysis

During closing argument in the punishment phase, the State discussed Aybar's extensive criminal history. As part of that discussion, the State made the following remarks of which Aybar now complains:

> Because it's all about that money. It's all about power. It's all about respect. Because bitches ain't shit.[4] He doesn't care about any of you, about any person who he broke into their car, who he stole their car. He does not care because he continues to do it.

On appeal, Aybar asserts that the State's remarks were an improper comment on his demeanor and his lack of remorse. He contends that such remarks would have been understood by the jury as a comment on his failure to testify.

---

[4]    During the punishment phase, the State introduced into evidence photos of Aybar's tattoos. One photo shows a tattoo on the back of Aybar's hand that reads, "Bitches Ain't Shit."

26

Commenting on a defendant's failure to testify does not fall within any of the permissible categories of jury argument and violates the United States and Texas Constitutions. *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001); *see* U.S. CONST. amend. V; TEX. CONST. art. I, § 10. "A comment on a defendant's lack of remorse is an impermissible reference to the defendant's failure to testify because only the defendant can testify as to his own remorse." *Orellana v. State*, 489 S.W.3d 537, 549 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). "The defendant's demeanor while in the courtroom is also an inappropriate subject for the State to discuss because it concerns facts not in evidence." *Id.* (citing *Davis v. State*, 964 S.W.2d 14, 17 (Tex. App.—Tyler 1997, pet ref'd)).

Aybar claims that his trial counsel's performance was deficient because he did not object to the complained-of remarks by the State. Even if we assume, without deciding, that the State's remarks were an improper comment on Aybar's failure to testify, we cannot conclude, on this record, that counsel's performance was deficient.

Ordinarily, counsel should have an opportunity to explain his actions before being held ineffective. *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Because no motion for new trial was filed, the record is silent regarding why Aybar's trial counsel did not object.

To satisfy the first prong of *Strickland* on a silent record, it must be apparent "that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Lopez*, 343 S.W.3d at 143; *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (stating that, to be deficient, attorney's conduct must "so outrageous that no competent attorney would have engaged in it"). Here, we do not have such a case. It is possible that Aybar's trial counsel chose not to object based on a reasonable trial strategy. *See Orellana*, 489 S.W.3d at 550 (holding that it could have been reasonable trial strategy for attorney not to object to State's remarks that appellant lacked remorse). "One such reasonably sound strategic motivation could have been the desire to avoid drawing additional attention to the prosecutor's opinion." *Kuhn v. State*, 393 S.W.3d 519, 539 (Tex. App.—Austin 2013, pet. ref'd); *see Lopez v. State*, 565 S.W.3d 879, 887 (Tex. App.—Houston [14th Dist.] 2018, pet. filed) ("[W]e have recognized that the failure to object to improper jury argument may be based on a reasonable trial strategy: to avoid drawing attention to the prosecutor's statement.").

In short, trial counsel has not been given a chance to explain his conduct. We cannot say that the counsel's conduct of not objecting to the complained-of jury argument was so outrageous that no competent attorney would have engaged

28

in it. *See Goodspeed*, 187 S.W.3d at 392; *Lopez*, 565 S.W.3d at 887. For these reasons, we conclude that Aybar has not demonstrated that his trial counsel's performance fell below an objective standard of reasonableness; thus, he has not satisfied the first *Strickland* prong. We hold that Aybar has failed to show, by a preponderance of the evidence, that he received ineffective assistance of counsel at trial. *See Strickland*, 466 U.S. at 687–88, 694.

We overrule Aybar's first issue in the manslaughter and aggravated-assault cases.

### Issues Related to Court Costs

In the remaining issues, Aybar challenges various costs assessed against him in each of the appeals.

**A.     Duplicative Court Costs**

In the third issue in the child-endangerment case and in the second issue in the aggravated-assault case, Aybar correctly contends that, under Code of Criminal Procedure article 102.073(a), the trial court erred in assessing duplicative court fees in each of the three cases. *See* TEX. CODE CRIM. PROC. art. 102.073. Under the statute, costs and fees may only be assessed once when, as here, a defendant is convicted of multiple offenses arising from a single criminal action. *See id.* The State agrees that the assessment of the duplicative costs in each judgment of conviction was error.

Article 102.073 of the Code of Criminal Procedure provides, in relevant part, as follows:

> (a) In a single criminal action in which a defendant is convicted of two or more offenses or of multiple counts of the same offense, the court may assess each court cost or fee only once against the defendant.
>
> (b) In a criminal action described by Subsection (a), each court cost or fee the amount of which is determined according to the category of offense must be assessed using the highest category of offense that is possible based on the defendant's convictions.

*Id.*

In each of the three judgments of conviction, court costs are listed "as assessed." The bill of cost accompanying each of the judgments shows the following identical fees and costs were assessed in each of the three cases:

- Sheriff's Jury Fee ($5)
- Commitments ($5)
- Release ($5)
- District Clerk's Fee ($40)
- Jury Fee ($40)
- Security Fee ($5)
- Consolidated Court Cost ($133)
- Jury Reimbursement Fee ($4)
- DC Records Preservation ($25)
- Support of Indg Defense ($2)
- Support of Judiciary Fee ($6)
- Court Technology Fee ($4)
- Electronic Filing State ($5)

These identical costs and fees total $279.

To determine in which case the costs and fees should be assessed, we first determine which offense is the highest category offense. *See id.* art. 102.073(b). As charged here, child endangerment is a state jail felony. *See* TEX. PENAL CODE § 22.041(c), (f). Manslaughter and aggravated assault, as charged, are second degree felonies. *See id.* §§ 19.04 (manslaughter), 22.02(a)(2), (b) (aggravated assault). Thus, manslaughter and aggravated assault are the higher-category offenses.

Between the manslaughter and aggravated-assault cases, we assess the fees in the case that has the lowest trial court cause number. *See Williams v. State*, 495 S.W.3d 583, 590 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd). Here, the case with the lowest cause number is the manslaughter case.[5] Accordingly, the costs and fees listed above, totaling $279, should be assessed in the manslaughter case. We modify the judgments in the child-endangerment and aggravated-assault cases to delete these costs. *See* TEX. R. APP. P. 43.2(b) (providing that the court of appeals may "modify the trial court's judgment and affirm it as modified"); *Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013) (concluding that, when trial court erroneously includes certain amounts as court costs in judgment, appeals court should modify judgment to delete erroneous amount).

---

[5] The trial court cause number in the manslaughter case is 1500417; the cause number in the aggravated assault case is 1500418.

31

We sustain Aybar's third issue in the child-endangerment case and the second issue in the aggravated-assault case

## B. Constitutionality of "Summoning Witness/Mileage" Fees

In his fourth issue in the child-endangerment case and in his second issue in the manslaughter case, Aybar complains that the "summoning witness/mileage" fees, ordered to be collected from him as a court cost under Texas Code of Criminal Procedure article 102.011(a)(3) and (b), violates the Separation of Powers Clause of the Texas Constitution. *See* TEX. CONST. art. II, § 1. Our Court rejected this constitutional challenge in *Allen v. State*, 570 S.W.3d 795, 808 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. granted) (op. on reh'g).[6] Following *Allen*, we reject Aybar's constitutional challenge to the assessment of court costs for the summoning witness/mileage fee. *See id.*; *Hines v. State*, 570 S.W.3d 297, 305 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (applying *Allen*).

We overrule Aybar's fourth issue in the child-endangerment case and his second issue in the manslaughter case.

## C. Jury Fee

Code of Criminal Procedure Article 102.004(a) authorizes the assessment of a $40 jury trial fee as a court cost. *See* TEX. CODE CRIM. PROC. art. 102.004(a). In

---

[6] The Texas Court of Criminal Appeals granted petition for review in *Allen* on December 20, 2018. The case was submitted to the Court of Criminal Appeals on March 27, 2019 and remains pending there as of the date of issuance of this memorandum opinion.

his third issue in the manslaughter case, Aybar argues that Article 102.004(a) is facially unconstitutional because it violates the separation-of-powers provision of the Texas Constitution in that it does not serve a legitimate criminal justice purpose. *See Salinas v. State*, 523 S.W.3d 103, 106–10 (Tex. Crim. App. 2017); *see also* TEX. CONST. art. II, § 1.

The Fourteenth Court of Appeals has held that article 102.004(a) does not violate the separation-of-powers doctrine because the $40 jury fee is used for legitimate criminal justice purposes. *Johnson v. State*, 562 S.W.3d 168, 179 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (op. on reh'g). The *Johnson* court determined that "section 113.004 [of the Code of Criminal Procedure] not only allows but mandates that jury fees collected under article 102.004 be used for some legitimate criminal justice purposes," specifically to pay expenses relating to criminal juries. *Id.*; *see* TEX. CODE CRIM. PROC. art. 113.004(b)(1).

The Second Court of Appeals, in *Alvarez v. State*, adopted the analysis and reasoning of *Johnson* and held that article 102.004(a) is not facially unconstitutional. *Alvarez v. State*, 571 S.W.3d 435, 441 (Tex. App.—Fort Worth 2018, pet. ref'd). We were recently presented with the same issue in *Gaskill v. State*, an appeal transferred to us from the Second Court of Appeals.[7] No. 01-18-

---

[7] *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals).

00606-CR, 2019 WL 2292987, at \*6 (Tex. App.—Houston [1st Dist.] May 30, 2019, no pet. h.). We applied the holding in *Alvarez* and "likewise conclude[d] that the $40 jury trial fee in article 102.004(a) is facially constitutional for the reasons set forth in *Johnson*.[8] *Id.* Today, in accordance with that conclusion, we hold that the $40 jury trial fee in article 102.004(a) is facially constitutional for the reasons set forth in *Johnson*, 562 S.W.3d at 174–80.

We overrule Aybar's third issue in the manslaughter case.

## Conclusion

We affirm the judgment of conviction in the manslaughter case (trial court cause number 1500417; appellate cause number 01-18-00019-CR). We modify the judgments of conviction in the child-endangerment case (trial court cause number 1493128; appellate cause number 01-18-00018-CR) and in the aggravated-assault case (trial court cause number 1500418; appellate cause number 01-18-00020-CR) to delete the $279 in duplicative court costs and fees that were assessed in all three cases, and we affirm those judgments as modified.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.

---

[8] *See* TEX. R. APP. P. 41.3.

34

Do not publish. TEX. R. APP. P. 47.2(b).